BOUTWELL *v.* STATE.

(Division B. Feb. 7, 1938. Suggestion of Error Overruled March 7, 1938.)

[178 So. 585. No. 32912.]

Jeff Collins, of Laurel, and Watkins & Eager, of Jackson, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for appellee.

Argued orally by **W. H. Watkins, Sr.**, and **Jeff Collins**, for appellant, and by **W. D. Conn, Jr.**, for the State.

**Ethridge, P. J.**, delivered the opinion of the court.

Winnie Boutwell was tried in the circuit court of Jasper county, and convicted of the murder of her husband, Walter Boutwell, who was killed on Sunday night, March 14, 1937. Boutwell was shot one time, just above and to

the right of the heart, with a shotgun, while in a toilet in the back of his yard, some sixty feet from the house; blood was found on the walls thereof, and on the wire fence, and traces of blood on the ground from the toilet to where the body was lying, some eighteen feet from the toilet, in the direction of the house. He fell there with his head toward the toilet, a sawed-off shotgun beside his body, the breast plate or metal on the end of which had been removed.

Immediately after the shot was fired the appellant called to her father and family, who lived some 200 yards distant, that ''Walter had shot himself.'' The father and other members of the family, and close neighbors, went to the house of appellant and viewed the body where it lay; but the appellant did not go to the body of her husband either before calling or afterwards. The sheriff of the county was sent for, and arrived about 10 o'clock at night; but between the time of the killing and the arrival of the sheriff a heavy rain had fallen, and tracks had been filled with rain water. The sheriff impaneled a jury, which, after viewing the body, returned a verdict of death by suicide. The sheriff interviewed the appellant that night, and she told him that she and her husband did not get along well together, that they had disagreements, and that he had often threatened suicide; that he ''fussed at her'' about her former husbands; and that on the night of the killing, or death, of Boutwell he had gone to the toilet where she was to meet him in a few minutes, but while she was still in the house she heard the shot fired. The sheriff testified that she did not seem greatly concerned about his death that night.

Further investigation being made by the sheriff, it was learned that the sawed-off shotgun belonged to Sherman Sims, a first cousin of the appellant; and on the following Saturday night he was arrested, and on his person were found shells similar to those in the gun—of the same make, etc. He was placed in the jail at Laurel; and

on the following night the appellant was arrested and placed in a different part of the same jail, where they were interviewed by the officers in the effort to find out more about the killing.

While in jail, the appellant wrote a note to Sherman Sims, which she handed to the colored porter in the jail, to be delivered to him. However, the porter, acting under direction of the jailer, turned the note over to the latter, as was his custom with all communications written by prisoners. This note said: "Say I want you to believe my folks are not working against you, and neither am I. I've told and they've told they believed you let Walter have the gun, and that what they are still telling so help me god. They haven't said one word against you to me and the paper lied when it said I accused you of the murder. I said I believed he killed himself. You lay all the blame on me and I haven't said aught against you, I swear it.

"Listen Sherman, tell them you have a new confession to make that you sold him the gun and he ask you to saw it off for him, but didn't say what he wanted with it nobody can prove you didn't let him have it. Now Sherman that's the only thing that will save us, and you had better listen to me, your folks and my folks say that's the only way out for us. For god's sake do this and we will both come out. Plead not guilty until you die. My lips are sealed I don't know nothing. Robert your daddy and my folks said tell you let him have it."

On May 6th Sherman Sims, while in jail, wrote the appellant as follows: "Dear Winnie: I guess you will be surprised to get a letter from me. It (made) me feel mighty good when they turned you a loose and what you told on the stand if that was all of it in the paper. I know that you want me to no what I wrote in that note they taken downstairs, I put in it you need not worry, I lied on you downstairs and I want you to forgive me. The reason I done what they said I would get bond and I

would get out and fix everything up, but you see how I got out no bond. I am your cousin right on and will be to the end and I don't mean to call your name in court what ever. I feel that it is my duty to write you and get forgive me. I got some things to tell you face to face. Well I will quit. Pray for me. Your cousin."

In July, 1937, Sherman Sims wrote to appellant: "Dear cousin: I guess you will be surprise to get a letter from me. Just the same I thought it was my duty to write you a few line and explain some things. I feel that you are mad with me for what I told on you. It is all a lie, the reason I told that was Jack Deavers said you said I kill Walter and I knew that was not so. I thought if you could make up a lie on me and tell it, I would make up one on you and tell it, but all the same it is a lie. I tried to tell them the truth for as I know but they would believe it about the insurance I did not so until they told me what the amount was. I want you to forgive me for lying on you, and that we would be cousins right on and be friendly on on on and that our folks would be friends. Your cousin, Sherman Sims."

There were some other notes testified about, but their contents are not in the record, and they were not introduced.

Green Sims, father of Sherman Sims, testified on the trial that appellant was his niece; that she told him, after his son had been arrested, that if he would say he "sold the gun to Walter that it would settle everything and stop the trouble"; and, further, that "You know a dead man can't talk."

Robert Sims, brother of Sherman Sims, testified to the same facts. Sherman Sims was introduced as a witness against the appellant, having pleaded guilty of the murder of Walter Boutwell and taken a life sentence. He stated that he was a first cousin of the appellant; that Walter Boutwell worked at the Masonite plant at Laurel; that on Saturday before his death he saw the deceased,

with the appellant, in Laurel, and also had seen her the Saturday before that; and that three weeks before the death of Walter Boutwell appellant asked him where she could get a short gun, and whether he would look around and find one for her; that on the following Saturday he met her in Laurel and reported that he had been unable to find what she needed, and she said, ''Find one if you can.'' On the next Saturday he told her he could not find one, but had a single barrel shotgun he could let her have, and she said, ''Fix it up, I want to be shut of my husband.'' She told him to disfigure the gun, so that it would not be recognized. And she said that in return she would give him part of the insurance policy. Sims sawed off the barrel of the gun and removed the brass butt plate, and placed it in the back of the car belonging to deceased, a model A roadster, parked by the Masonite plant, at about 4:30 or 5 o'clock Sunday afternoon. He said he also wrapped up three shells that went along with the gun. At the time of his last conversation with Winnie Boutwell in Laurel she gave him $5 to fix the gun up. He had taken the gun from his home that afternoon, and disfigured it before reaching Laurel, cutting off some 6 or 8 inches of the barrel. On cross-examination Sims admitted that he had lied about the matter on several occasions, but testified to the truth of the facts above stated.

The wife and son of Sherman Sims testified that he left home on Saturday afternoon, taking the gun, and that he returned about 8 o'clock that night without it.

B. P. Coleman, supervisor of personnel of the Masonite plant in Laurel, where Walter Boutwell worked, and worked on the day of his death that night, said that he was at work until about 3:30 in the afternoon; that Boutwell carried two policies of life insurance, one for $1,000 and one for $600; that on July 9, 1936, the beneficiary in the $600 policy was changed from Boutwell's two children to ''Winnie Sims (friend)''—appellant's name prior to her marriage; that deceased married her after

this change in the policy; that on December 15, 1936, he had both policies changed, making "Winnie S. Boutwell, wife," the beneficiary. He stated that demand was made for the payment of these policies by the appellant three days after Boutwell's death at which time she came to his office.

From the record it appeared that the policies had been paid prior to the trial. On the night of the killing the jury assembled by the sheriff had returned the verdict of suicide. It also appeared that on a habeas corpus for bail the appellant was discharged because the state refused to introduce its proof at that time.

The appellant and her son testified that when the shot was fired she was in the house talking to her thirteen year old son, and that when the shot was fired she ran to the back door and called, "Walter! Walter!" and then, without going out to where the body was, went to the front door and called to her father's family. Her younger son was at his grandfather's—her father—when the shot was fired, and her father testified that shortly prior to the killing the dogs were barking violently at something about the shop where the car of Walter Boutwell had been placed, and where it was kept, at the home of appellant's father.

The sheriff and jury on the night of the killing seem not to have made a careful examination of the clothing worn by the deceased, as to whether the shot which killed him went through the shirt and union suit worn by deceased at the time of his death. It had rained, and the deceased had been left where he lay until the sheriff could arrive and view the body. It did appear that there was a rip from the collar of the shirt to about the waist band, and that the top button on the shirt was unbuttoned. The deceased had on a dress shirt; but some of the jury could not say whether he had on underwear, or of what character it was; one of the witnesses said he had on a heavy union suit, and another thought it was a light union suit.

It is urged that the evidence is insufficient to show that the killing was not suicide, and insufficient to show whether it was done by the appellant or by Sherman Sims; and that technically there is a reasonable theory that the deceased did commit suicide, and that the proof is insufficient to sustain the conviction on circumstantial evidence. We have given this matter full consideration, and we think the jury were warranted in finding the appellant guilty. The gun by the body was positively identified as belonging to Sherman Sims. It is quite improbable, from the nature of the wound, that the deceased could have fired the gun and carried it 18 feet to the place where it was found. Sherman Sims' testimony was sufficient to connect the appellant with the death, and to establish her guilt. Whether she fired the shot, or whether it was fired by Sherman Sims, was immaterial; if either did the killing, both were guilty. Sims had pleaded guilty, and taken a life sentence. He testified, and his testimony, taken in connection with all the other evidence, would warrant the jury in believing that the deed was committed either by him or by the appellant. It is argued that the corpus delicti was not sufficiently established, but we think this entirely without merit. At common law suicide is a crime for which the penalty of forfeiture of goods was imposed. While our law does not impose this penalty, suicide is an unlawful act, and the death in this instance is established as having come about through a criminal agency. The only question open to discussion is whether the appellant was the criminal agent. If a person procures another to commit suicide, that person is guilty of the crime, because the act of suicide itself is a crime, although under our law there is now no method of applying punishment on the person suiciding; but if a person should attempt suicide and fail therein, he could be convicted of an attempt, and punished under our laws on the subject of attempts.

We have examined the instructions given in the case, and do not find any error that would warrant us in granting a new trial.

The judgment of the court below is therefore affirmed. Affirmed.