# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-02532-SCT

*CANDICE YOUNG, PERSONAL REPRESENTATIVE OF THE WRONGFUL DEATH BENEFICIARIES OF CHERIE S. HANCOCK, DECEASED*

*v.*

*DONALD C. GUILD, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/24/2004 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RONALD M. KIRK |
| ATTORNEYS FOR APPELLEE: | DENISE C. WESLEY |
| | WHITMAN B. JOHNSON, III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART- 10/30/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     In this wrongful death suicide case, the Court must consider several evidentiary issues and determine whether the trial court properly instructed the jury. The Court must also consider whether the Irresistible Impulse Doctrine bars recovery when the wrongful death beneficiaries have alleged medical malpractice.  Finding error, we reverse and remand for a new trial.

# FACTS

¶2.     Jim Herring, Cherie S. Hancock's divorce attorney, referred his client to Donald Guild, M.D., a psychiatrist, for a mental evaluation and medical treatment. Herring wanted Dr. Guild's expert opinion for a divorce proceeding that involved Hancock and her husband, George Thomas Hancock. Hancock's mental state was at issue in the proceeding.

¶3.     Dr. Guild first met with Hancock on August 7, 1999. Hancock informed Dr. Guild that during the 1990s her relationship with her husband and children had deteriorated; she had suffered a miscarriage; and she previously had shot herself in the chest, attempting to commit suicide. Hancock visited Dr. Guild's office again on August 16, 1999. Dr. Guild began to treat Hancock on an inpatient basis at St. Dominic Hospital in Jackson, Mississippi, on August 20, 1999.

¶4.     On September 15, 1999, Dr. Guild testified at Hancock's divorce hearing. When asked the question, "[D]o you have an opinion as to what her condition would be if she is not allowed to move back into [her] house and have free reign?", Dr. Guild responded:

> I really just don't want to think about that. I don't think it will be good at all. I hope she would make it, but we have to find another place for her to live. It won't be permanent. It will be a temporary place. And for anybody else, for most other people, they could look ahead and see the fact that they're going to come out all right. But I'm afraid she can't do that. With her depression and everything, it's going to be clouded, she's going to be hopeless. I'm afraid she will take her life.

¶5.     Dr. Guild was also asked how long he thought Hancock would need to be hospitalized. Dr. Guild responded, "I think I could put her back into the house in two days. I would feel comfortable doing that. If she goes someplace else I just wouldn't estimate." Further, when

2

asked how life threatening it would be, in Dr. Guild's opinion, for Hancock not to be allowed to go back to her house, Dr. Guild responded:

> I can't put a figure on it. I can't put anything [sic], but I couldn't recommend it. I'm here today because I'm very fearful there is a good chance that if she doesn't have that situation, she won't be here and the need for a divorce won't be before the court.

Dr. Guild discharged Hancock from the hospital on Friday, September 17, 1999.

¶6.    Dr. Guild formulated a discharge plan for Hancock, which provided that she live with her mother and stepfather.  According to the plan, Hancock was to be "with someone at all times if possible . . . . [and] [i]f there was anything unusual . . . [her mother and step-father] were to let [Dr. Guild] know."  Hancock's parents were supposed to make sure that she took her medications and met with Dr. Guild on an outpatient basis.  Dr. Guild did not speak with Hancock's parents regarding the discharge plan, but he delegated that task to a social worker and Herring.  Hancock committed suicide on September 20, 1999, three days after her release from St. Dominic Hospital.

¶7.    As part of its investigation of Hancock's suicide, the Yazoo County Sheriff's Department discovered various suicide notes at the suicide scene and Hancock's mother's house.  Throughout the notes, Hancock blamed her husband for her impending suicide, and she assigned her possessions to various family members.  Hancock also left a note telling her children how much she loved them.

## PROCEDURAL HISTORY

¶8. On September 14, 2001, Candice Young, individually and as personal representative of the wrongful death beneficiaries of Hancock, filed a complaint against Dr. Guild. Young alleged that Hancock was under the care and treatment of Dr. Guild from August 6, 1999, until her death on September 20, 1999. Young specifically alleged that Dr. Guild directly and proximately caused Hancock's death by his negligence in: (1) failing to meet his duty of care in treating Hancock; (2) failing to adequately assess and screen Hancock as a suicide risk prior to releasing her from the hospital; and (3) failing to take reasonable steps to eliminate or mitigate situational factors of which he was aware that constituted a danger to Hancock and enhanced her ability to take her own life.

¶9. Dr. Guild filed an Answer on October 18, 2001. He admitted that he had provided treatment to Hancock prior to her death and that Hancock had taken her life by firearm on September 20, 1999. Dr. Guild affirmatively pleaded Section 85-5-7 of the Mississippi Code Annotated and the doctrine of illegality.

¶10. During discovery, Dr. Guild's counsel repeatedly attempted to depose Herring and eventually filed a Motion to Compel the deposition. In Plaintiff's Response to Defendant's Motion to Compel, Young asserted the attorney-client privilege and the work product doctrine on behalf of the deceased Hancock. Thereafter, the trial court denied the Motion to Compel Herring's deposition by Order filed April 5, 2004. The Order did not contain any grounds for the denial, and the transcript of the hearing could not be located.

¶11.   Dr. Guild also filed a Motion for Summary Judgment, contending that suicide was a common law criminal act, and therefore, the illegality defense barred Young's claims against Dr. Guild.   Further, Dr. Guild argued that since suicide is generally a superceding cause precluding liability, Young was required to show that her case qualified for the exception recognized in Mississippi, the Irresistible Impulse Doctrine.  Dr. Guild averred that Young failed to show that Dr. Guild committed an intentional tort which caused an irresistible impulse in the decedent to commit suicide.  Dr. Guild also argued that the suicide notes found by the Yazoo County Sheriff's Department demonstrated that Hancock understood the consequences of shooting herself; thus, her acts were volitional and not compensable.

¶12.   Young responded that the defense of superceding cause is inapplicable in cases based upon the doctor/patient relationship. Young argued the jury should determine whether the suicide was foreseeable and judge the reasonableness of Dr. Guild's actions.  Young asserted that there were genuine issues of material fact as to whether Dr. Guild took reasonable steps to prevent Hancock's suicide.

¶13.   The trial court denied the motion for summary judgment without explanation on April 5, 2004.  A jury trial was conducted August 17-19, 2004.  Young called six witnesses, including Dr. Guild as an adverse witness. Dr. Guild was questioned about whether he performed a suicide risk assessment and prepared a discharge plan.

¶14.   Young also called Dr. Raymond F. Patterson to testify as a forensic psychiatry expert. Patterson testified that Dr. Guild violated the standard of care by failing to perform a proper suicide risk assessment.  Patterson opined that Dr. Guild discharged Hancock prematurely.

5

Patterson also testified that Dr. Guild had an inadequate discharge plan to assist Hancock's survival in the community at the time of discharge. Patterson testified that Dr. Guild violated the standard of care in implementing the discharge plan when Dr. Guild failed to speak directly with Hancock's mother and stepfather prior to her discharge.

¶15. Dr. Guild called four witnesses. Donna Carey Pigg, Hancock's best friend, identified handwritten letters sent to her by Hancock. Pigg also testified about Hancock's interaction with her family. Dr. Guild essentially testified that he had met the standard of care regarding his treatment of Hancock. Willie Bell Hood, the deputy clerk at the Yazoo County Sheriff's Department, provided testimony about a fax the Department sent to Dr. Guild's counsel. Hood verified the date on the cover sheet as her handwriting, but she could not identify the papers in the file as those she faxed or attest who placed the papers in the file. Last, Dr. Sandra Holly testified as an expert in the field of psychiatry that Dr. Guild had met the standard of care in his treatment of Hancock.

¶16. At trial, Dr. Guild's counsel made this offer of proof regarding the testimony of Herring:

> [W]e would expect him to testify consistent with the - - testify with regard to Ms. Hancock's state of mind regarding how she was being treated and the effect it had on her, with regard to her discharge situation that she wanted to be - - wanted to go to her mama's home, she didn't want to stay in the hospital. He talked to Dr. Guild, and he also thought it was the right thing to do. She was not suicidal. Those would be the two main things, although we would also expect him to confirm various discussions he had with Dr. Guild that's been testified to by Dr. Guild.

¶17. After the offer of proof, the trial court denied any testimony from Herring. Because the court denied the testimony, Dr. Guild requested the court give a negative inference instruction to the jury. The court refused the instruction without comment.

¶18. The jury returned a verdict for Dr. Guild on August 24, 2004. A final judgment was entered by the trial court on August 26, 2004. On November 22, 2004, the trial court denied Young's motion for a new trial. On December 17, 2004, Young appealed, and on December 29, 2004, Dr. Guild cross-appealed.

## DISCUSSION ON DIRECT APPEAL

¶19. Young raises the following issues on direct appeal:

I.     Whether the Trial Court Erred When It Granted All Abstract Instructions and Denied Young's Proposed Instructions P-5 And P-6.

II.    Whether the Trial Court Erred in Denying Young an Apportionment Instruction.

III.   Whether It Was Reversible Error for the Trial Court To Admit into Evidence Cherie Hancock's Suicide Notes.

IV.    Whether the Cumulative Errors Of the Admission Of Inappropriate References to Privileged Information and Inadmissible Hearsay of Conversations with the Decedent Constitute Reversible Error.

I.     **Whether the Trial Court Erred When It Granted All Abstract Instructions and Denied Young's Proposed Instructions P-5 and P-6.**

¶20. A party is entitled to a jury instruction so long as it concerns a genuine issue of material fact and there is credible evidence to support the instruction. *Mariner Health Care, Inc. v. Estate of Edwards*, 964 So. 2d 1138, 1156 (Miss. 2007) (citing *DeLaughter v.*

7

*Lawrence County Hosp.*, 601 So. 2d 818, 824 (Miss. 1992)). However, this Court will not reverse based on the denial of an instruction unless it is shown that the granted instructions, taken as a whole, do not fairly present the applicable law. *Id.* (citing *Whitten v. Cox*, 799 So. 2d 1, 16 (Miss. 2000)).

¶21.    When considering a refused jury instruction, the trial court is afforded considerable discretion, and the Court's primary concern on appeal is that "the jury was fairly instructed and that each party's proof-grounded theory of the case was placed before it." *Cohen v. State*, 732 So. 2d 867, 872 (Miss. 1998) (citing *Splain v. Hines*, 609 So. 2d 1234, 1239 (Miss. 1992) (citing *Rester v. Lott*, 566 So. 2d 1266, 1269 (Miss. 1990))). When analyzing the grant or refusal of a jury instruction, two questions should be asked: Does the instruction contain a correct statement of law and is the instruction warranted by the evidence? *Beverly Enters. v. Reed*, 961 So. 2d 40, 43-44 (Miss. 2007) (citing *Hill v. Dunaway*, 487 So. 2d 807, 809 (Miss. 1986)). A party is entitled to have jury instructions given that present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Harris v. State*, 861 So. 2d 1003, 1012-13 (Miss. 2003) (citing *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000), *superceded by rule of evidence,* Miss. R. Evid. 702, *as recognized in* *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (Miss. 2003)).

¶22.    This Court has held that "[i]nstructions should be tied to the specific facts of the case and when given merely in the abstract, may be grounds for error." *McCarty v. Kellum*, 667

So. 2d 1277, 1287 (Miss. 1995) (quoting **T. K. Stanley, Inc. v. Cason**, 614 So. 2d 942, 952 (Miss. 1992)). "The test to determine whether or not an instruction is abstract is to determine whether or not the instruction relates to facts shown by the evidence on the issues involved in the case. If an instruction merely relates a principle of law without relating it to an issue in the case, it is an abstract instruction and should not be given by the Court." **Id.** at 1288 (quoting **Fred's Stores, Inc. v. M & H Drugs, Inc.**, 725 So. 2d 902, 918 (Miss. 1998)). "Abstract instructions on legal principles unrelated to facts and issues set out in the instructions are dangerous, because, although they may be correct in principle, they require legal training to properly interpret." **Id.** at 1287. Instructions that do not inform the jury what actions or facts constitute negligence run the risk of allowing the jury to determine questions of law as well as questions of fact. **Peoples Bank & Trust Co. v. Cermack**, 658 So. 2d 1352, 1361 (Miss. 1995). However, the Court has also noted that "of late where we instruct our juries that all instructions must be considered as a whole, we do not consider abstractness as much of a vice, though we still do not regard it a virtue." **M & H Drugs, Inc.**, 725 So. 2d at 918.

¶23.    Young argues that the trial court erred when it refused Instruction Nos. P-5 and P-6. Young contends that the jury was not properly instructed as to the Plaintiff's theory of the case. The trial court has the responsibility to instruct the jury on the law applicable to the case and to ensure that any legal errors which are raised by the parties are corrected. *See* **Savory v. First Union Nat'l Bank of Del.**, 954 So. 2d 930, 934 (Miss. 2007) (citing **Griffin v. Fletcher**, 362 So. 2d 594, 595 (Miss.1978)).

9

¶24.    Young argues Instructions P-5 and P-6 properly advised the jury of the facts, law, and theory of the case. Young also contends that the jury instructions were abstract as a whole, since they only instructed the jury on the basic elements of negligence without any reference to specific conduct. Young argues that the court should have at least admitted some version of P-5 or P-6 in order to tie the facts of the case to the applicable law.

¶25.    Instruction 5 read:

> If you find from a preponderance of the evidence in this case that:
>
> 1. Given the circumstances of Cherie S. Hancock's medical condition during the time the defendant, Donald C. Guild, saw and treated her, a minimally competent physician and psychiatrist who had available the same general facilities, services, equipment and options as Donald C. Guild had during the time she was his patient would not have discharged Mrs. Hancock on September 17, 1999 from St. Dominic Hospital without performing a comprehensive suicide assessment and preparing an adequate discharge plan that included taking reasonable steps to provide a supportive environment and support system to Mrs. Hancock upon discharge; and
>
> 2. The defendant Donald C. Guild failed to comply with this standard of care in his treatment of the plaintiff; and
>
> 3. Such failure on the part of Donald C. Guild constituted a proximate cause or contributing proximate cause of the suicide death of Mrs. Hancock, then you must return a verdict for the plaintiff against the defendant, Donald C. Guild.

¶26.    Instruction P-6 read:

> If you find [sic] a preponderance of the evidence in this case that:
>
> 1. Cherie S. Hancock was a patient of Dr. Donald C. Guild; and
>
> 2. While a patient of Dr. Guild, Cherie S. Hancock was suffering from a mental and physical condition; and

10

3. Defendant, Donald C. Guild, should have reasonably been aware of Mrs. Hancock's condition and was aware that she had previously attempted to commit suicide in 1996; and

4. That on September 15, 1999, defendant, Donald C. Guild testified in open court under oath in the presence of Cherie S. Hancock in a divorce preceding that in his opinion, if Cherie S. Hancock were not allowed to move back into the marital house that she would take her own life; and

5. That Donald C. Guild, knowing that Cherie S. Hancock, had not been allowed by the Court to return to the marital house, discharged her from St. Dominic Hospital two (2) days later on September 17, 1999 without performing a comprehensive suicide assessment or otherwise preparing an adequate discharge plan that included taking reasonable steps to provide a supportive environment and support system for Mrs. Hancock upon discharge; and

6. That Donald C. Guild failed to provide the care and attention that Cherie S. Hancock's condition reasonable [sic] required and which a reasonable prudent and minimally competent psychiatrist treating Mrs. Hancock would have provided; and

7. That Donald C. Guild's failure to provide such care and attention was the proximate cause or a proximate contributing cause of Cherie S. Hancock's self-inflicted death by firearms on September 20, 1999, then your verdict should be for plaintiff.

¶27. Regardless of whether or not the trial court should have granted P-5 and/or P-6, the trial court failed to fulfill its ultimate duty to properly instruct the jury with any instruction that tied the facts and issues of the case to the law of negligence. This Court finds the jury instructions as a whole are abstract. When read in toto, the instructions provided the jury with the appropriate standard of care but did not relate the standard of care to the facts and issues of the case. The trial court should have given Young the opportunity to place before the jury an instruction that informed the jury of all matters the Plaintiff contended were at issue and necessary to prove her theory of the case.

11

¶28. Therefore, this Court holds that when a trial court is put on notice of a legal issue on which the jury should be instructed, it is the court's ultimate duty to properly instruct the jury on that issue.[1] *Kolberg v. State*, 829 So. 2d 29, 45 (Miss. 2002) ("There is no doubt that the trial court is ultimately responsible for rendering proper guidance to the jury via appropriately given jury instructions."). The Court reverses the judgment, since the given jury instructions were all abstract, and when read in toto, they failed to present Young's theory of the case.

**II.** **Whether the Trial Court Erred in Denying Young an Apportionment Instruction.**

¶29. Young argues that she was entitled to this apportionment instruction. At trial, Young orally tendered the following instruction:

> I'm proposing to say that . . . we, the jury find for the plaintiff and assess the damages, so you may apportion those damages as follows, and list the wrongful death beneficiaries, each one of them, and let the jury say – for instance, Your Honor, he's going to argue that the house – that's the home, the fact that the husband and the minor son, the part about cutting the phone line off and getting the divorce. I've got to two wrongful death beneficiaries that weren't even living at home, had been gone for four years. Any apportionment of damages as to causation by the husband or the smallest son cannot be imputed to the other two.[2]

---

[1]This Court acknowledges that a trial court is not required to instruct the jury sua sponte or give instructions in addition to those tendered by the parties. *Harris v. State*, 861 So. 2d 1003, 1016 (Miss. 2003) (citing *Gray v. State*, 728 So. 2d 36, 60 (Miss. 1998)); *see also Samuels v. State*, 371 So. 2d 394, 396 (Miss. 1979) (It is not generally the obligation of the trial court to prepare and submit jury instructions on behalf of the State or the defendant).

[2]Although the record is not clear, it appears Young wanted an apportionment instruction because she feared her individual claims would be reduced because of the alleged negligence of other heirs.

¶30. Young argues the apportionment statute, Section 85-5-7 of the Mississippi Code Annotated, and the comparative negligence statute, Section 11-7-15 of the Mississippi Code Annotated, direct the jury to consider all conduct that may have proximately contributed to an injury. According to Young, the trial court should have given the jury an apportionment instruction pursuant to Section 85-5-7, since Dr. Guild put forth evidence that Thomas Hancock and other family members caused Hancock to commit suicide. Dr. Guild's testimony indicated several times that Hancock's family exacerbated her mental condition. He referred to notes from previous doctors suggesting Hancock's children and particularly, her husband, mentally and physically abused her. Dr. Guild also stated that her family knew from a previous doctor that she was not to have access to any guns. Pigg's testimony included various references to negative interactions between Hancock and her family and how the divorce and those interactions had adversely affected Hancock.

¶31. On the other hand, Dr. Guild asserts that Young waived the right to request an apportionment instruction when Young swore in an interrogatory response that no heir-at-law exacerbated Hancock's mental illness. Dr. Guild cites *Coho Resources, Inc. v. McCarthy*, where this Court held that a failure to raise the issue of another tortfeasor during discovery barred the right to an apportionment instruction. *McCarthy*, 829 So. 2d 1, 24 (Miss. 2002).

¶32. In *McCarthy*, the plaintiff served an interrogatory on the defendants, requesting the identity of any parties the defendants would contend caused the accident. *Id.* The defendants did not identify any additional parties in their answer, nor did they supplement their response.

13

*Id.* Consequently, the Court found they had waived any right they had to apportion fault to another tortfeasor. *Id.*

¶33. The Court finds that *McCarthy* controls the outcome for this issue. Young stated in a discovery response that no heir had exacerbated Hancock's mental illness. Young provides no other theory as to how an heir could be held partially responsible for the suicide. Thus, Young's denial is binding on her, and waives her right to an apportionment instruction.

### III. Whether It Was Reversible Error for the Trial Court To Admit into Evidence Cherie Hancock's Suicide Notes.

¶34. The standard of review governing the admissibility of evidence is whether the trial court abused its discretion. *Bullock v. Lott*, 964 So. 2d 1109, 1132 (Miss. 2007). An erroneous evidentiary ruling alone does not warrant reversal. *Young v. City of Brookhaven*, 693 So. 2d 1355, 1358 (Miss. 1997). The Court must determine whether the proper legal standards were applied and prejudice resulted before reversal is warranted. *Id.*

¶35. Dr. Guild entered as an exhibit suicide notes the sheriff's office found in Hancock's bedroom and in her mother's home. The exhibit also contained handwritten letters, which Pigg and Young attested were written by Hancock. At trial, Young objected to the admission of the suicide notes and argued they were never authenticated. The objection was overruled. Young contends the admission of the suicide notes is reversible error.

¶36. Rule 901 of the Mississippi Rules of Evidence governs the authentication requirements for evidence. *Sewell v. State*, 721 So. 2d 129, 140 (Miss. 1998). Authentication requires evidence sufficient to support a finding that the matter in question is what its proponent

14

claims. *Id.*; Miss. R. Evid. 901(a). A person's handwriting may be authenticated by a lay witness who is familiar with the handwriting. *Sewell*, 721 So. 2d at 140 (citing *Hentz v. State*, 542 So. 2d 914, 917 (Miss. 1989)). Such an authenticated document may be used by the trier of fact in comparison with a specimen for which authenticity is in question. Miss. R. Evid. 901(b)(3). A party need only make a prima facie showing of authenticity, not a full argument on admissibility. *Sewell*, 721 So. 2d at 140. "Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic." *Id.*

¶37. The Court finds that the letters Hancock wrote to Young and her children while hospitalized were sufficiently authenticated by Young's testimony. Likewise, during her trial testimony, Pigg sufficiently authenticated a letter Hancock wrote to her. The trial court appropriately allowed the jury to compare the letters with the unauthenticated suicide notes. This issue is without merit.

**IV.** **Whether the Cumulative Errors of the Admission of Inappropriate References to Privileged Information and Inadmissible Hearsay of Conversations with the Decedent Constitute Reversible Error.**

¶38. The standard of review governing the admissibility of evidence is whether the trial court abused its discretion. *Bullock v. Lott*, 964 So. 2d 1109, 1132 (Miss. 2007). An erroneous evidentiary ruling alone does not warrant reversal. *Young v. City of Brookhaven*, 693 So. 2d 1355, 1358 (Miss. 1997). The Court must determine whether the proper legal standards were applied and prejudice resulted before reversal is warranted. *Id.*

15

**A.     Whether Dr. Guild's Counsel Erred When He Made Comments Regarding Hancock's Divorce Attorney After Young Invoked the Attorney-Client Privilege.**

¶39.     Young contends Dr. Guild's counsel inappropriately commented to the jury that they would not hear from Hancock's divorce attorney, Jim Herring, despite Young's claim of the attorney/client privilege.  Young claims that these comments were prejudicial to her, since they left the jury to consider that Herring's testimony would have been detrimental to her. Dr. Guild responds that the trial judge instructed the jury to disregard the comment about Herring, so any error was cured.

¶40.     In *Parker v. Jones County Community Hospital*, this Court ruled that certain testimony violated the Mississippi Rules of Evidence and was inadmissible.  *Parker*, 549 So. 2d 443, 445 (Miss. 1989).  The Court then noted the trial court sustained the objection to the testimony and instructed the jury to disregard the testimony.  *Id.*  The Court stated that "[t]he law of error and curative instructions seems to be an analog to harmless error."  *Id.* "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do."  *Jerry Lee's Grocery, Inc. v. Thompson*, 528 So. 2d 293, 295 (Miss. 1988).  Thus, a trial court's admonishment to the jury to disregard an improper question and answer is generally sufficient to cure any taint.  The Court concludes that this issue does not contribute to any reversible error.

**B.     Whether the Trial Court Erred in Admitting Hearsay in the Form of Conversations between Pigg and Hancock**.

16

¶41.    Young also avers that throughout Pigg's examination, Pigg referred to conversations between herself and Hancock which were hearsay. Young further argues that the statements were irrelevant, unfairly prejudicial, confusing, and misleading. Dr. Guild notes that Young failed to identify any particular statements. Dr. Guild also argues that Young elicited hearsay statements, similar to those complained of, when she testified about conversations between herself and Hancock. Dr. Guild further argues the conversations were hearsay exceptions, as they went to Hancock's state of mind.

¶42.    Young broadly states that Pigg's testimony constituted hearsay, but failed to provide this Court with any reference to that testimony. Without support from the record, this Court is not required to rule upon the merits of Young's argument. *See Varvaris v. Perreault,* 813 So. 2d 750, 753 (Miss. Ct. App. 2001) ("The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied upon."). Therefore, we need not decide this issue.

### C.    Whether the Trial Court Erred in Admitting Hearsay in the Form of Undocumented Conversations between Dr. Guild and Hancock.

¶43.    The third error Young raises is that Dr. Guild, during his examination, repeatedly referenced conversations between himself and Hancock. Dr. Guild claims that these conversations contained statements made for the purpose of medical diagnosis or treatment. However, Young replies that these statements do not meet the trustworthiness requirement of Mississippi Rule of Evidence 803(4) because they were not written down in Dr. Guild's

17

medical records. Dr. Guild argues that Mississippi Rule of Evidence 803(4) contains no such requirement or limitation.

¶44.   Once again, Young has failed to provide this Court with any direction as to the specific testimony at issue.  Without support from the record, this Court is not required to rule upon the merits of Young's argument.  Therefore, the Court does not decide this issue.

### ON CROSS-APPEAL

¶45.    Dr. Guild raises the following issues on cross-appeal:

I.  Whether the Trial Court Erred in Denying Summary Judgment Because Young Failed to Provide Evidence Sufficient for the Irresistible Impulse Doctrine.

II.  Whether the Court Should Have Allowed Dr. Guild to Depose Herring.

III.  Whether the Court Erred in Denying Dr. Guild's Inference Instruction.

**I.       Whether the Trial Court Erred in Denying Summary Judgment Because Young Failed to Provide Evidence Sufficient for the Irresistible Impulse Doctrine.**

¶46.   "This Court reviews summary judgments de novo." ***Univ. of Miss. Med. Ctr. v. Easterling***, 928 So. 2d 815, 817 (Miss. 2006) (citation omitted).  Pursuant to Rule 56 of the Mississippi Rules of Civil Procedure, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Miss. R. Civ. P. 56(c).  The court views the evidence in the light most favorable to the nonmoving

18

party. *Easterling*, 928 So. 2d at 817. "The moving party bears the burden of demonstrating there is no genuine issue of material fact." *Id.*

¶47. In Mississippi, suicide is a common law crime. *Boutwell v. State*, 181 Miss. 509, 178 So. 585, 587 (1938); *see Shamburger v. Grand Casino of Miss., Inc.*, 84 F. Supp. 2d 794, 798 (S.D. Miss. 1998). Suicide is usually an intervening, superceding cause that cuts off liability. *See State ex rel. Richardson v. Edgeworth*, 214 So. 2d 579, 586 (Miss. 1968) (stating that "[r]ecovery in wrongful death actions has been denied in several cases where the decedent committed suicide, on the ground that the suicide was an unforeseeable, intervening cause of death"). In 1968, this Court recognized the Irresistible Impulse Doctrine as an exception to the rule that a plaintiff could not recover for a suicide. *See id.* at 579. Under the Irresistible Impulse Doctrine, a plaintiff may recover when a tortfeasor has (1) committed an intentional tort that (2) causes an irresistible impulse in the decedent to commit suicide. *See id.* at 587.

¶48. In *Edgeworth*, the plaintiffs alleged that two justices of the peace and their deputies committed intentional torts, the abuse of process, which led to the decedent's suicide. *Id.* at 586. The Court declined to consider the criminality of the decedent's suicide, since the "plaintiffs' evidence [made] a jury issue as to whether as a result of defendants' intentional torts, [the decedent] acted under an irresistible impulse and committed suicide." *Id.* The Court found that the "intentional conduct [of the defendants was] a legal cause of harm to the plaintiffs [since] their individual acts were substantial factors in bringing about the harm." *Id.* The Court held:

19

> [W]here the suicide is committed in response to an uncontrollable impulse, recovery may be had *if the mental state of deceased was substantially caused* by the defendant's intentional wrongful acts, and whether they were substantial factors in bringing about the death by suicide may be issues for the jury.

*Id.* at 587 (emphasis added). Because the facts showed the decedent acted under an irresistible impulse, the Court did "not reach the additional issues considered in *Tate v. Canonica*, which allowed recovery for suicide caused by an intentional tort if the mental stress which the defendant inflicted was a substantial cause of the suicide, even if the decedent was aware of his act and was not responding to an irresistible impulse." *Id.* at 586 (citing *Tate v. Canonica*, 180 Cal. App. 2d 898 (1960)).

¶49.    The Court in *Edgeworth* also looked to a prior case, *Prentiss Truck & Tractor Co. v. Spencer*, 228 Miss. 66, 87 So. 2d 272 (1956), as support for its holding. In *Spencer*, a widow filed for death benefits under the Mississippi Workmen's Compensation Act. *Spencer*, 87 So. 2d at 273-74. She claimed benefits after her husband committed suicide due to a work injury. *Id.* at 275. Under the Workmen's Compensation Act, the plaintiff had to show the decedent's death was not willful. *Id.* at 276. The Court affirmed an award of compensation, since the evidence showed:

> [T]he deceased employee took his life at a time when he was suffering from a mental disturbance of depressive insanity and did not have the mental capacity to determine the consequences of his act; that his mental condition was *brought about* by the injury received by him while working for his employer, and that his reasoning faculties were so far impaired that his self-destruction was not voluntary and wilful.

*Id.* at 279 (emphasis added).

20

¶50. The federal courts have followed *Edgeworth* and allowed compensation for a suicide *only* upon a showing that an intentional tort caused an irresistible impulse which then caused the decedent to commit suicide. For instance, in *Shamburger v. Grand Casino of Mississippi, Inc.*, the decedent's heirs claimed that Grand Casino caused the decedent to commit suicide when it turned over bad checks written by the decedent to the district attorney. *Shamburger*, 84 F. Supp. 2d 794, 796-98 (S.D. Miss. 1998). The federal court applied Mississippi law, recognizing that *Edgeworth* was the "seminal case" that articulated the Irresistible Impulse Doctrine. *Id.* at 798. The court stated "Mississippi now apparently permits recovery if, at the time of suicide, the decedent was acting under an irresistible impulse proximately caused by the intentional wrongful conduct of the defendant." *Id.* The court then articulated the following test for recovery in Mississippi: 1) the decedent must suffer from a "mental disturbance";[3] 2) the decedent must not act volitionally with the understanding of his consequences; and 3) "the impulse must in fact be proximately caused by the wrongful conduct of the defendant."[4] *Id.* at 799. The court granted summary judgment to the defendant, Grand Casino, since the plaintiffs had failed to provide expert testimony that the decedent had suffered from an irresistible impulse at the time of death. *Id.* Expert

---

[3]The court then went into a lengthy discussion of a "mental 'condition'" versus a "mental 'illness,'" and found a plaintiff must show that the decedent suffered from a mental illness at the time of death. *Id.* at 799-800. If the decedent suffers from a mental condition, the court found that the suicide is volitional, and thus, an intervening cause. *Id.*

[4]*Shamburger* requires expert testimony that the suicidal actions of the decedent arose from an irresistible impulse. *Id.* at 799.

21

testimony established the decedent acted volitionally in committing suicide. *Id.* at 800. The court ruled that the decedent's actions were voluntary, and as such, the suicide broke the causal chain. *Id.* at 799.

¶51. In *Gunn v. City of Corinth*, the decedent committed suicide by hanging himself with his belt in a jail cell. *Gunn*, No. 1:90-CV-222-B-D, 1999 U.S. Dist. LEXIS 4263, at *2 (N.D. Miss. Mar. 30, 1999). The jail officers were supposed to search and remove personal items such as the belt prior to placing the detainee in the cell. *Id.* The officers failed to remove the belt and failed to monitor the cell. *Id.* at *3-*4. The district court stated "[t]o assert a claim under Mississippi law for wrongful death from suicide, the plaintiff must show that the suicide was committed in response to an irresistible impulse proximately resulting from the defendant's intentional wrongful act." *Id.* at *10-*11 (citations omitted). The court held that the plaintiff failed to make a prima facie case of wrongful death, since the plaintiff did not put forth any evidence that the officers committed an intentional tort. *Id.* at *11. The Court also noted that the officer's failure to remove the belt aided the decedent, but the failure did not cause an irresistible impulse. *Id.*

¶52. The Court of Appeals has also recently considered the Irresistible Impulse Doctrine in the context of a wrongful death suicide case. In *Collums ex rel. Collums v. Union Planters Bank, N.A.*, the plaintiffs alleged that the bank's foreclosure of the decedent's business caused the decedent to commit suicide. *Collums*, 832 So. 2d 572, 575-76 (Miss. Ct. App. 2002) (upholding circuit court's grant of summary judgment to defendants). The plaintiffs asserted various claims, including intentional infliction of emotional distress and negligent

infliction of emotional distress. *Id.* at 576. The ***Collums*** court cited ***Edgeworth*** for the proposition that "suicide is actionable if the suicide is proximately caused by intentional wrongdoing by the defendant and is the result of an irresistible impulse." *Id.* at 577 (citing ***State ex rel. Richardson v. Edgeworth***, 214 So. 2d 579, 585-88 (Miss. 1968)). The court noted that it "view[ed] irresistible impulse as a failure to control the body and not be able to understand the consequences of certain actions." *Id.* at 578. The Court of Appeals could not identify an intentional tort by the defendants. *Id.* The Court of Appeals also ruled that the decedent "planned his suicide and knew the benefits that his family would receive upon his death from his life insurance policies." *Id.*

¶53.    Although the Irresistible Impulse Doctrine remains part of Mississippi law, this Court has never addressed its applicability in the context of a medical malpractice case filed against a doctor who treated a patient for the mental condition which led to the patient's suicide. This Court, the Mississippi Court of Appeals, and the United States District Court for the Southern District have decided cases in which claimants were allowed to proceed on a theory of negligence in wrongful death suicide cases. None of these cases, however, address the common law rule barring recovery in suicide cases. *See **Estate of Moffett v. SmithKline Beecham Corp.,*** No. 1:03cv532WJG-JMR, 2005 U.S. Dist. LEXIS 34326 (S.D. Miss. June 9, 2005); ***Carrington v. Methodist Med. Ctr., Inc.***, 740 So. 2d 827 (Miss. 1999); ***Mississippi State Hosp. v. Wood***, 823 So. 2d 598 (Miss. Ct. App. 2002).

¶54.    In ***Carrington***, the decedent committed suicide while in the care of the Methodist Medical Center. *Carrington*, 740 So. 2d at 828. The plaintiffs alleged that Methodist "failed

23

to exercise ordinary and reasonable care in the custody of James Carrington, that Methodist departed from the generally accepted and recognized standard of care and skill in the care and custody of James Carrington . . . ." *Id.* Methodist asserted immunity under Mississippi Code Annotated Section 41-21-105 (Rev. 2005), which grants immunity for good faith acts in commitment proceedings. *Id*. This Court held "the statute does not immunize negligent custodial care." *Id*.

¶55. In *Mississippi State Hospital v. Wood*, the Court of Appeals applied the physician standard of care in determining whether a hospital was liable for a patient's suicide. *Wood*, 823 So. 2d at 602. In *Wood*, the patient voluntarily committed herself, and while receiving treatment in the hospital, she committed suicide. *Id.* at 600. The trial court and Court of Appeals analyzed the case as a normal medical malpractice case.[5] *See Id.* at 600-602. The Court of Appeals affirmed the trial court's judgment for the plaintiff, stating "we find that there is, beyond question, substantial evidence in the record to support the trial court's factual determination establishing both the standard of care and its violation by MSH." *Id.* at 602.

¶56. In *Estate of Moffett v. SmithKline Beecham Corp.*, the plaintiff filed a wrongful death suicide action alleging "negligence, strict liability, breach of express and implied warranties, breach of contract, fraud, battery, and loss of consortium." *Moffett*, No. 1:03cv532WJG-

---

[5]This Court notes the plaintiff's expert testified the hospital's actions "substantially increased the likelihood that [the decedent] would have both the opportunity and a *compelling psychological impulse to do harm to herself.*" *Id.* at 601 (emphasis added). While the expert's opinion addresses an "impulse," that impulse was not caused by an intentional tort, a required element under the Irresistible Impulse Doctrine.

24

JMR, 2005 U.S. Dist. LEXIS 34326 *2-*3 (S.D. Miss. June 9, 2005). The plaintiff's husband committed suicide after taking Paxil for depression. *Id.* at *2. The defendants moved for summary judgment. *Id.* at *1.

¶57. The court analyzed the case under Mississippi's product liability statute. *Id.* at *6. The court found that the plaintiff's expert report was inadequate and the expert failed to show Paxil caused the decedent to commit suicide. *Id.* at *11-12. The court noted while "some degree of speculation is necessary in cases which turn on medical causation, the Mississippi Supreme Court has insisted, 'that proof of causation remain within the realm of the reasonably probable,' rather than 'the merely speculatively possible.'" *Id.* (quoting *Harris v. Shields*, 568 So. 2d 269, 273 (Miss. 1990)).

¶58. We hold today that the Irresistible Impulse Doctrine is inapplicable to a physician or other medical provider from whom treatment is sought for a mental condition, where the plaintiff claims that the negligent care led to the suicide. Such cases must proceed under the analysis required in other medical negligence cases. Applying these principles to today's case, we hold the trial court did not err in denying summary judgment to Dr. Guild.

## II. Whether the Court Should Have Allowed Dr. Guild to Depose Herring.

¶59. This Court has stated "'[t]he application of privilege is properly a mixed question of law and fact, with the circuit court's factual findings reviewed for clear error and its interpretation of the law reviewed de novo.'" *Nester v. Jernigan*, 908 So. 2d 145, 147 (Miss.

2005) (quoting ***Hewes v. Langston***, 853 So. 2d 1237, 1241 (Miss. 2003) (citing ***United States v. Neal***, 27 F.3d 1035, 1048 (5th Cir. 1994))).

¶60.    Pursuant to Rule 502 of the Mississippi Rules of Evidence, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing *confidential communications* made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative . . . ." Miss. R. Evid. 502(b) (emphasis added); *see also* Miss. Code Ann. § 73-3-37(4) (Rev. 2008) (stating that an attorney has the duty "[t]o maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients"). Confidential communications can be actions as well as words. ***Hayden v. State***, 972 So. 2d 525, 532 (Miss. 2007). A representative of a lawyer is a person "employed by the lawyer to assist the lawyer in the rendition of professional legal services." Miss. R. Evid. 502(a)(4). A representative of a client is "one having authority to obtain professional legal services, or to act on advice rendered thereto . . . ." Miss. R. Evid. 502(a)(2).

¶61.    A communication is not confidential if it is made in the presence of a third party "unless it complies with the statement in Rule 502(a)(5)." Miss. R. Evid. 502 cmt. Under Rule 502(a)(5), "[a] communication is *confidential* if not *intended* to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Miss. R. Evid. 502(a)(5) (emphasis added). The intent of the client is "inferred from the particular circumstances." Miss. R. Evid. 502 cmt. Furthermore, "[t]he

26

privilege may be claimed by . . . the personal representative of a deceased client."  Miss. R. Evid. 502(c).

¶62.    Dr. Guild argues the trial court should have allowed his counsel to depose Herring, since Herring was involved in implementing Dr. Guild's discharge plan.  Furthermore, Herring initially referred Hancock to Dr. Guild.  Dr. Guild also states that he was barred from receiving relevant documents from Herring.

¶63.    Dr. Guild argues that the attorney-client privilege should not apply to unprivileged communications or documents.  Additionally, Dr. Guild states he should have been allowed to question Herring about the following: 1) communications between Dr. Guild and Herring; 2) communications between Herring and Hancock's parents; 3) communications between Herring and Hancock in Dr. Guild's presence; 4) observations of Hancock's behavior; and 5) observations of the interaction of Hancock with her family.

¶64.    Dr. Guild cites *Hewes v. Langston* in support of his argument that the court should have at least allowed a limited deposition.  *Hewes*, 853 So. 2d 1237 (Miss. 2003).  In *Hewes*, the plaintiff requested that the trial court compel the defendant to produce certain documents which the defendant claimed were privileged.  *Id.* at 1239.  After an in camera review, the trial court ruled that some of the documents were discoverable while others were privileged.  *Id.*  On appeal, the defendant argued that all the documents were protected by the attorney-client privilege.  *Id.* at 1240.

¶65.    In *Hewes*, this Court noted that the attorney-client privilege "'relates to **all information** regarding the client received by the attorney in his professional capacity and in

27

the course of his representation of the client.'" ***Id.*** at 1244 (quoting ***Barnes v. State***, 460 So. 2d 126, 131 (Miss. 1984)). The Court then conducted a de novo review to determine whether the documents were discoverable, since the trial court twice failed to "conduct an item by item review" and provide a "specific explanation of the . . . basis for concluding why certain documents were discoverable and why certain documents were not." ***Id.*** at 1240, 1249-50. The Court stated "[w]e reiterate that when objections to discovery of specific documents are made, the trial court should deal with each on an item-by-item basis, carefully considering each objection, deciding whether to allow discovery, and stating the rule of exception which provides the basis for the decision." ***Id.*** at 1250.

¶66.    Young correctly counters that Dr. Guild's Motion to Compel did not request any documents from Herring.  Dr. Guild requested only to depose Herring.  Young also argues that Dr. Guild failed to demonstrate the relevance of Herring's testimony or any resulting prejudice from the denial of the deposition.

¶67.    In his offer of proof, Dr. Guild proposed that Herring should be allowed to testify about Hancock's state of mind regarding how she was treated by her family and how she felt about being discharged to her mother's home.  On appeal, Dr. Guild also requested that Herring provide testimony of the interaction between Hancock and her family. Whether Herring gleaned Hancock's state of mind from her behavior or actual statements, such actions and statements are protected by the attorney-client privilege if they were confidential and made in the context of Hancock's legal representation.  On remand, the trial court should inquire into the circumstances and substance of these actions, statements, and interactions, in order

28

to determine if the attorney-client privilege is applicable. The trial court should use the item-by-item approach of ***Hewes v. Langston,*** 853 So. 2d 1237 (Miss. 2003), as a model for determining whether these actions and statements are privileged.

¶68. In his offer of proof, Dr. Guild's counsel also stated that he expected Herring to confirm conversations to which Dr. Guild already had testified. Conversations between Dr. Guild and Herring (regardless of Hancock's presence) are protected under the attorney-client privilege, since Dr. Guild was acting as Herring's representative pursuant to Rule 502(a)(4) when he treated Hancock. Although these conversations are privileged, this Court finds that Young waived the attorney-client privilege during the following cross-examination of Dr. Guild (called by Young as an adverse witness) regarding the discharge plan:

> Q Right. But what I'm saying is you don't know if you talked to the mother or not, do you?
> A Yes, I do.
> Q You know you did?
> A Well, I know Mr. Herring did.
> Q No, do you know – well, did you talk to her?
> A I don't know that I talked to her.
> Q You don't know if Mr. Herring talked to her, do you?
> A I know that.
> Q Okay. So you don't know if he talked to her or not, do you?
> A I don't believe Mr. Herring would lie. It's possible, but very unlikely.
> Q *What did Mr. Herring tell her?*
> A *He told her what we discussed.*
> Q *What was that?*
> A The main thing was that she was to be with somebody as much of the time, if anything changed, let us know, and take her medicine, come to the appointments.
>                     . . . .
> Q Well, I thought the attorney did the contacting of the mother?
> A He did too. It was double.
> Q *What did they tell her? Do you know what they told her?*

29

A     I didn't hear the conversation.

¶69.    Young's attorney asked specific questions regarding the conversations between Dr. Guild and Herring regarding the discharge plan and its implementation. Young also asked Dr. Guild about the substance of Herring's conversations with Hancock's mother.  This Court finds instructive ***Jackson Medical Clinic for Women, P.A. v. Moore***, 836 So. 2d 767 (Miss. 2003), in support of waiver.

¶70.    In ***Moore***, the defendant issued a subpoena duces tecum to the plaintiff's former attorney.  ***Moore***, 836 So. 2d at 768.  The plaintiff filed a motion to quash the subpoena duces tecum, asserting the attorney-client privilege, and the court granted the motion.  ***Id.***  On appeal, the defendant asserted that the plaintiff had waived the attorney-client privilege by statements she made in an affidavit and during a deposition.  ***Id.*** at 771-72.  In her affidavit and deposition, the plaintiff had testified to discussions she had had with her former attorney. ***Id.***

¶71.    In its analysis of waiver, this Court stated "'[o]nce the client has effectively waived the privilege, the attorney is competent as a witness regarding matters otherwise within the scope of the privilege.'" ***Id.*** at 771 (quoting ***Barnes v. State***, 460 So. 2d 126, 131 (Miss. 1984)). This Court also looked to ***American Standard, Inc. v. Bendix Corp***., 80 F.R.D. 706, 708 (W.D. Mo. 1978) and ***Metropolitan Life Insurance Co. v. Aetna Casualty & Surety Co.***, 249 Conn. 36, 730 A.2d 51, 52-53 (1999), for the rule that the attorney-client privilege is waived when a litigant voluntarily injects a material issue into a case.  ***Id.*** at 773.  This Court quoted the following from ***Aetna Casualty***:

[E]xception [to the attorney-client privilege] is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship.

*Id.* (quoting *Aetna Casualty*, 730 A.2d at 52-53). The Court held the plaintiff had voluntarily testified about otherwise privileged communications; thus she effectively waived the privilege. *Id.*

¶72.    This Court finds *Jackson Medical Clinic for Women, P.A. v. Moore*, 836 So. 2d 767 (Miss. 2003), analogous to the facts at hand. Young's attorney directly questioned Dr. Guild about conversations between Herring and himself and Herring and Hancock's mother. Young's counsel voluntarily elicited testimony regarding the substance of privileged conversations and injected a material issue into the case. The discharge plan and its implementation was a material issue before the trial court. This Court finds a limited waiver as to these noted discussions. *Cf. **Century 21 Deep S. Props., Ltd. v. Corson***, 612 So. 2d 359, 374 (Miss. 1992) (ruling that the "attorney-client privilege can be waived for limited purposes").

¶73.    On remand, the trial court should allow Herring to testify about conversations with Dr. Guild that concern the discharge plan and its implementation. Herring should also be allowed to testify about conversations he had with Hancock's mother that concerned the discharge plan and its implementation. The trial court may allow further testimony after an item-by-item review of the topic or area of proposed testimony, including the context of such

31

communications. The court may consider any other information it deems prudent in order to determine whether the communication was confidential and within the scope of the attorney-client relationship. In line with ***Hewes v. Langston***, 853 So. 2d 1237 (Miss. 2003), the court should consider each objection, decide whether to allow the discovery, and state the rule or exception which provides the basis for the decision.

### III. Whether the Court Erred in Denying an Inference Instruction.

¶74. Because this Court finds that Herring is allowed to give limited testimony, the issue of an inference instruction is now moot.

### CONCLUSION

¶75. On Young's direct appeal, the judgment is reversed and the case is remanded for further proceedings and a new trial consistent with this opinion, since the jury instructions as a whole were abstract. The remaining errors asserted on direct appeal are without merit. As for the cross-appeal, the Court affirms the trial court's denial of summary judgment because the Irresistible Impulse Doctrine is inapplicable in this case. On remand, Dr. Guild should be allowed to take a limited deposition of Jim Herring, and the trial court is instructed take an item-by-item approach to any further issues of attorney-client privilege or work product doctrine.

¶76. **ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**DIAZ, P.J., EASLEY, GRAVES AND DICKINSON, JJ., CONCUR. RANDOLPH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND CARLSON, J. WALLER, P.J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶77.  I concur with the well-reasoned Majority opinion, but for Issue I. regarding jury instructions.  The Majority reverses and remands the case, finding that "the given jury instructions were all abstract, and when read in toto, they failed to present Young's theory of the case." (Majority Opinion at paragraph 28).  I respectfully disagree, finding no error in the jury instructions given, for collectively they pronounce the applicable rules of law.

¶78.  The central issue at trial was whether the applicable standard of care was satisfied, *vel non*, regarding Dr. Guild's suicide risk assessment, discharge plan, and communication thereof.  The propriety of the suicide risk assessment, discharge plan, and Dr. Guild's communication of same were matters of disputed expert testimony, which the jury was free to reject or accept.  The purpose of a jury instruction is to give the jury the law.

¶79.  "If an instruction merely relates a principle of law without relating it to an issue in the case, it is an abstract instruction and should not be given by the Court." *Freeze v. Taylor*, 257 So. 2d 509, 511 (Miss. 1972).  However, even "defects in specific instructions do not require reversal 'where all instructions taken as a whole fairly – although not perfectly – announce the applicable primary rules of law.'"[6] *Wallace v. Thornton*, 672 So. 2d 724, 729 (Miss. 1996) (quoting *Burton v. Barnett*, 615 So. 2d 580, 583 (Miss. 1993)).  Reviewing the jury

---

[6]"Of late where we instruct our juries that all instructions must be considered as a whole, we do not consider abstractness as much of a vice, though we still do not regard it a virtue." *Splain v. Hines*, 609 So. 2d 1234, 1241 (Miss. 1992).

33

instructions as a whole, "other instructions to the jury did provide the jury with appropriate facts and specific standards." *McCarty v. Kellum*, 667 So. 2d 1277, 1288 (Miss. 1995). *See also Fred's Stores v. M&H Drugs, Inc.*, 725 So. 2d 902, 918 (Miss. 1998) ("[w]hen read as a whole . . . the jury was fairly instructed in this case."); *Beckwith v. Shah*, 964 So. 2d 552, 555 (Miss. Ct. App. 2007) ("when read in toto with the other instructions, we find that the jury was provided with appropriate standards and facts."). Furthermore, "[t]he granting of an abstract instruction is not ordinarily considered to be a reversible error unless it tends to confuse and mislead the jury." *Freeze*, 257 So. 2d at 511. I find no confusion in the instructions given which would mislead the jury.

¶80. Jury Instruction No. 5 as modified defines negligence and the standard of care for a physician in this state, and is neither misleading or confusing, stating:

> [t]he Court instructs the jury that the word "negligence" as used in these instructions with regard to Dr. Guild's actions means the doing of some act which a reasonably prudent, minimally competent psychiatrist treating a patient such as Ms. Hancock would not have done under the same or similar circumstances, or the failure to do some act which a reasonably prudent, minimally competent psychiatrist treating a patient such as Ms. Hancock would have done under the same or similar circumstances. Therefore, if you believe that, during his care and treatment of Ms. Hancock, Dr. Guild acted as a reasonably prudent, minimally competent psychiatrist would have acted when faced with the same or similar circumstances, it is your duty to return a verdict for the defendant, Dr. Guild.

> If you believe that, during his care and treatment of Ms. Hancock, Dr. Guild failed to act as a reasonably prudent, minimally competent psychiatrist would have acted when faced with the same or similar circumstances, it is your duty to return a verdict for the plaintiffs.

34

This instruction clearly "'announce[s] the applicable primary rules of law.'"[7] *Wallace*, 672

So. 2d at 729 (quoting *Burton*, 615 So. 2d at 583). The instruction fairly states the medical

malpractice standard of care previously established by this Court. *See Bickham v. Grant*, 861

So. 2d 299, 303 (Miss. 2003); *McCarty v. Mladineo*, 636 So. 2d 377, 381 (Miss. 1994)

(recommended jury instruction).

¶81.	Jury Instruction No. 6 ties facts regarding Hancock's suicide following her release

from the hospital to the principles of law in Jury Instruction No. 5, *see Freeze*, 257 So. 2d at

511, as well as introducing the legal principle that a physician is not the insurer of a patient's

well-being, stating:

> [t]he Court instructs the jury that you may not return a verdict against Dr. Guild
> simply because Ms. Hancock committed suicide after being released from the
> hospital. Instead, the burden of proof is on the plaintiff to prove that the
> psychiatrist was guilty of negligence which caused the injury. In this case, the
> plaintiff must prove by a preponderance of the evidence that Dr. Guild was
> negligent in his treatment of Ms. Hancock and that such negligence, if any,
> caused her suicide. Therefore, before the plaintiff is entitled to a verdict in any
> amount whatsoever against Dr. Guild, she must prove by a preponderance of
> the evidence (1) that Dr. Guild failed to act as a reasonably prudent, minimally
> competent psychiatrist would have acted when faced with the same or similar
> circumstances, and (2) that such failure, if any, proximately caused Ms.
> Hancock's death.

Recognizing the "considerable discretion" extended to the trial court as to "the form and

substance of jury instructions[,]" *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998), when

---

[7]Likewise, Jury Instructions No. 1a, 3, 8, and 9, which were clearly patterned on the
Mississippi Model Jury Instructions, announce the applicable primary rules of law on the
preponderance of the evidence standard, proximate cause, and the consideration of expert
witness testimony. *See* Mississippi Model Jury Instructions - Civil §§ 1.28, 1:38, 15:3, 15:4
(West 2007).

the jury instructions considered as a whole "provide[d] the jury with appropriate facts and specific standards[,]" *McCarty*, 667 So. 2d at 1288, there is no basis for reversal.

¶82.    Even assuming *arguendo* that some jury instructions were abstract, there is no support that they "tend[ed] to [so] confuse and mislead the jury[,]" as to constitute reversible error. *Freeze*, 257 So. 2d at 511.  *See also Fred's Stores*, 725 So. 2d at 918 ("[w]e find that these instructions would not tend to confuse or mislead the jury, and therefore, we hold any error for abstractness to be harmless."); *Beckwith*, 964 So. 2d at 555 ("[i]n reviewing all of the jury instructions, we do not find that instructions C-7 and D-4 are confusing or misleading as to suggest that the jury misunderstood its role or the law.").  Young was not prohibited from offering her factual theories expressly to the jury.  Therefore, any suggested error should not be deemed reversible, and the judgment entered on the jury verdict should be affirmed.

**SMITH, C.J., AND CARLSON, J., JOIN THIS OPINION.**