# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-IA-01286-SCT

*JACKSON MEDICAL CLINIC FOR WOMEN, P. A.,*
*MERCER LEE, III, M.D., DARDEN H. NORTH, M.D.*
*AND PARACELSUS WOMAN'S HOSPITAL, INC.*

*v.*

*GRACE POLLES MOORE AND ROBERT ALAN*
*MOORE, INDIVIDUALLY AND AS PERSONAL*
*REPRESENTATIVES AND WRONGFUL DEATH*
*BENEFICIARIES OF ROBERT ALAN MOORE, JR.,*
*DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/19/1999 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WHITMAN B. JOHNSON, III |
| | THOMAS CREAGHER TURNER |
| | JOSEPH L. McNAMARA |
| ATTORNEYS FOR APPELLEES: | DANA J. SWAN |
| | RICHARD B. LEWIS |
| | DENNIS C. SWEET, III |
| NATURE OF THE CASE: | CIVIL/MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 01/30/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1.     On August 7, 1995, Grace Polles Moore and Robert Alan Moore (the Moores), individually, and

as personal representatives and wrongful death beneficiaries of Robert Alan Moore, Jr., filed their

complaint in the Circuit Court of Hinds County, First Judicial District.  The Moores claimed medical

negligence against the Jackson Clinic for Women, P.A., Dr. A. Mercer Lee, III, Dr. Darden H. North (collectively, Jackson Clinic), and Paracelsus Woman's Hospital (now the Woman's Hospital), alleging damages for the wrongful death of their stillborn child, and for personal injuries sustained by themselves. On November 14, 1995, Jackson Clinic filed a motion for summary judgment,[1] claiming the Moores' action was barred by the two-year statute of limitations for medical negligence, Miss. Code Ann. § 15-1-36. The motion for summary judgment was denied. Jackson Clinic then filed a petition for interlocutory appeal with this Court concerning the statute of limitations issue, which we denied on May 22, 1996.

¶2.     On February 20, 1997, Jackson Clinic issued a subpoena duces tecum to Mrs. Moore's previous attorney, Michael Hartung, to produce all files, correspondence, documents, or other things related to the representation of the Moores in this matter. The Moores filed a motion to quash the subpoena duces tecum, which was granted by the circuit court by order on March 10, 1997. A motion to reconsider was then filed, which was similarly denied.

¶3.     On October 29, 1998, Jackson Clinic again filed a motion for summary judgment, along with a motion for disclosure of records and other relief, which was denied by the circuit court on July 19, 1999. On April 28, 2000, Jackson Clinic again petitioned this Court for an interlocutory appeal, this time on the issue of waiver of attorney-client privilege, which this Court granted by order on April 13, 2000. *See* M.R.A.P. 5. Jackson Clinic states its issue on interlocutory appeal as follows:

> **DOES THE PLAINTIFFS' VOLUNTARY USE OF ADVICE AND COMMUNICATIONS FROM THEIR FORMER ATTORNEY AS A BASIS TO AVOID DEFENDANTS' STATUTE OF LIMITATIONS DEFENSE WAIVE THE ATTORNEY-CLIENT PRIVILEGE SO AS TO ALLOW DEFENDANTS TO CONDUCT DISCOVERY REGARDING THE FORMER ATTORNEY'S FILE AND ADVICE?**

---

[1]The Woman's Hospital joined the motion for summary judgment on December 1, 1995.

¶4.     Concluding that Jackson Clinic's appeal is well taken, we reverse and remand.

## FACTS

¶5.     On or about August 24, 1992, Grace Polles Moore, who was pregnant at the time, entered Woman's Hospital complaining of abdominal pain. Moore was under the care of Dr. Lee and Dr. North, physicians practicing with the Jackson Clinic for Women. It was determined that Moore was suffering from a twisted bowel, which required a cesarian section be performed, along with a resection of her small bowel; the baby was stillborn.

¶6.     Moore, herself a registered nurse, contacted attorney Michael Hartung in December of 1992, who in turn requested the medical records of her treatment in August from the two doctors, the clinic and the hospital. Hartung forwarded the records to an expert, Dr. Richard A. Nicholls, for review. Dr. Nicholls opined, in a letter dated April 5, 1993, that Jackson Clinic was not negligent and may have in fact saved her life:

> Although Mrs. Polles [Moore] presented at multiple times with abdominal pain during her pregnancy, she had a history of multiple gastrointestinal problems and previous abdominal surgeries which alone could have accounted for her abdominal pain, manifesting the signs and symptoms that she presented with. Volvulus with gangrene of the bowel is an <u>acute</u> happening, not chronic. There was no way to diagnose this condition until it happened. It is unfortunate that the patient was pregnant at the time, because gangrene of the bowel did cause her baby's death; however, she was very fortunate that her physicians recognized that she had an acute surgical abdomen and that they acted appropriately because had they not, she would also be dead. Her physicians are not guilty of malpractice, but they are responsible for saving her life.

¶7.     According to Moore, later that year in November of 1993, she was hospitalized at the Mississippi Baptist Medical Center due to chronic abdominal pain, nausea, vomiting, bloating, and diarrhea, as a result of her short bowel syndrome. Her treating physician referred her to the Mayo Clinic in Jacksonville, Florida. Moore claims that it was during this treatment at the Mayo Clinic, in January of 1994, that "she

3

was alerted to the fact that her treatment in August 1992, may have been the cause of the death of her baby and of her short bowel syndrome." Moore retained a different attorney, Richard B. Lewis, in April 1994, who then forwarded her medical records to Dr. Charles Cesare, a gynecologist licensed to practice in Mississippi. Dr. Cesare reached a different conclusion than Dr. Nicholls had previously:

> Subsequently, on or about September 15, 1994, more complete medical records of Mrs. Moore were made available to me. Based upon the additional records of the hospital, I was able to determine that she did not receive the minimum standard of care from the treating physicians, and from the hospital, Paracelsus Woman's Hospital. She was not properly evaluated and monitored during the night. Had a proper evaluation been done, her baby could have been saved and her intestine could have been saved.
>
> In my opinion, the type of injury sustained by Mrs. Moore resulting from the medical care given by her treating physicians, as well as Paracelsus Woman's Hospital, Inc., was a latent injury whose cause could not be readily ascertained except by a thorough review of all medical records by a physician. I am aware that Mrs. Moore is a registered nurse, however, this would not give her the expertise necessary to determine whether or not there was a causal relationship between her injuries and the care which she received on August 24, 1992.
>
> On October 8, 1995, I met with Mr. and Mrs. Moore and informed them of my opinion.

## STANDARD OF REVIEW

¶8.     When the issues presented on an interlocutory appeal are questions of law, this Court will review those issues, as other questions of law, de novo. ***Gant v. Maness***, 786 So. 2d 401, 403 (Miss. 2001).

## DISCUSSION

¶9.     Jackson Clinic devotes a considerable amount of its brief to discussing why the Moores' causes of action should have been barred by the statute of limitations and why summary judgment should have been granted by the trial court. However, we did not grant this interlocutory appeal to consider that issue. Since this Court has previously denied an interlocutory appeal on the issue on the statute of limitations and summary judgment, we will limit our discussion of that issue to what is necessary

4

to fully understand the issue that is properly before this Court, namely, whether Moore has effectively waived the attorney-client privilege.

### A. Statute of Limitations—Discovery Rule

¶10. Mississippi has a two-year statute of limitations for medical malpractice claims. Miss. Code Ann. § 15-1-36 (Supp. 2002). The action must be "filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." *Id.* § 15-1-36(1). This Court has termed this the "discovery rule" and has interpreted the rule to mean that "the operative time is when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner." *Sarris v. Smith*, 782 So. 2d 721, 723 (Miss. 2001) (quoting *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986)). "Application of the discovery rule is a fact-intensive process." *Sarris*, 782 So. 2d at 725. Still, if the plaintiff "fails to bring suit because he is incompetently or mistakenly told he does not have a case, we discern no sound reason for visiting the consequences of such on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit." *United States v. Kubrick*, 444 U.S. 111, 124, 100 S.Ct. 352, 62 L. Ed. 2d 259 (1979).

¶11. Jackson Clinic argues that the statute of limitations for the Moores' causes of action began to run upon receipt of Mrs. Moore's medical records by her former attorney, Michael Hartung, around January of 1993. In that case, the suit would be time barred because the Moores did not file their complaint until more than two and one-half years later. Contrarily, the Moores claim that the injury sustained by Mrs. Moore was latent and was not discovered until sometime between January and September of 1994; thus, the claim was filed well within the two-year statute of limitations. However, this Court need not decide which party is correct as that issue is not now before this Court. The only issue on this interlocutory appeal

is whether Moore waived the attorney-client privilege by allegedly revealing otherwise privileged communications with her previous attorney, Michael Hartung, to defeat Jackson Clinic's motion for summary judgment.

### B.    Waiver of Attorney-Client Privilege

¶12.    In Mississippi, the attorney-client privilege is established by the Mississippi Rules of Evidence. Pursuant to our evidentiary rules: "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional services to the client . . . ." Miss. R. Evid. 502(b). *See also* Miss. Rules of Prof'l Conduct R. 1.6. It is the attorneys' duty "[t]o maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients." Miss. Code Ann. § 73-3-37(4) (2000).

¶13.    This Court has said that "the privilege relates to and covers all information regarding the client received by the attorney in his professional capacity and in the course of his representation of the client." *Barnes v. State*, 460 So. 2d 126, 131 (Miss. 1984). And while "[o]nly the client may invoke the privilege," the client may also waive the privilege in certain circumstances. *Id.* "Once the client has effectively waived the privilege, the attorney is competent as a witness regarding matters otherwise within the scope of the privilege." *Id.* In *Bennett v. State*, 293 So. 2d 1 (Miss. 1974), *overruled on other grounds by Triplett v. State*, 579 So. 2d 555 (Miss.1991), we cited the rule concerning "effective" waiver of the privilege by a client:

> While a client does not lose the benefit of the privilege where he is compelled, against his protest, to disclose confidential statements, if he voluntarily introduces testimony relating to such communications, his privilege may not thereafter be asserted. Thus, where he voluntarily testified, as a witness, to confidential communications made by him to his attorney, he thereby waives the privileged character of such communications, and he and his attorney may then be fully examined in relation thereto.

6

*Bennett*, 293 So. 2d at 5 (quoting 58 Am. Jur. *Witnesses* § 526).

¶14.    Jackson Clinic asserts that Moore effectively waived the attorney-client privilege in her sworn

affidavit where she stated:

> Sometime in December of 1992, I consulted attorney Michael Hartung about a possible malpractice action as a result of the previously mentioned medical treatment.  I executed a medical release on or about December 23, 1992.  I requested that he obtain all pertinent medical records.
>
> On or about April 5, 1993, Dr. Richard A. Nicholls, M.D., who examined the records, wrote a letter to my attorney, a copy of which was later given to me.  I was informed that I had no cause of action against the Defendants sometime in April, 1993, by attorney Hartung.

¶15.    Jackson Clinic further asserts that Moore waived the privilege during her deposition when she

testified:

> Q.    Once you get out of the hospital, how soon after you get out of the hospital do you go see a lawyer?
>
> A.    Oh, the first time I saw a lawyer was December of 1993, around then.
>
> Q.    Are you sure it wasn't December of '92 . . .
>
> A.    It was probably December of '92 . . .
>
> Q.    Had you talked with Alexis any about needing to pursue a claim prior to the time you went to see a lawyer?
>
> A.    Oh, I—this is what I said.  I was in the hospital, and I had not spoken to anybody about anything of that nature.  I looked at Alexis, and I said, "Something was wrong.  Something was real wrong."  And she said, "Grace, I'm glad you said that."  She said, "We've talked about it, the family, and we know it, but we didn't want to say it to you because we didn't know if you could handle it."
> [. . .]
>
> Q.    Do you know what they did in investigating the claim?
>
> A.    All I know that Michael Hartung said was that he sent my records to a physician on the Coast, and that's all I know.
>
> Q.    Did you know what that physician said?
>
> A.    Yes.  I knew that he had said that, basically, he could not say there was cause for the medical records that he had.  What he was reviewing, there was not cause.
> [. . .]
>
> Q.    This is your affidavit.  It says, "I was informed I had no cause of action against the defendant sometime in April, 1993 by Attorney Hartung."  How many different meetings did you have with Mr. Hartung about your case?

7

A. To the best of my memory, I saw Michael Hartung one time, and that was it, the initial visit.

[. . .]

Q. Was there ever a conversation that you had with him that you remember where he just said, "Look, we are not going to do anything more." Because you are with Ricky now, and you were with Hartung, and I'm trying to figure out how did you become notified that he wasn't going any further with it?

A. I was notified—actually, I—it was—I don't want to sound ugly, but it was basically, like he thought I had a case, but he didn't know enough medical people that he was centered in Jackson to send to.

Q. Okay.

A. Kind of like a small-community type thing knowing everybody.

Q. So when you last talk with him, you got the impression he thought there was something there, but he just couldn't find anybody?

A. Yes I did.

[. . .]

Q. —you believed that he thought there was a case there but that he just couldn't find an expert because of the Jackson community?

A. Kind of, sort of.

[. . .]

Q. Is that the conversation when you called him to see if you had all your medical records from him that you had the impression he thought there was something there, but he just couldn't find an expert?

A. That's what I understand that he said.

Q. Okay.

A. Just—and like I say, it was just off-the-cuff. He knew I had gotten my records. We weren't pursuing anything, and that was it.

¶16. Jackson Clinic claims that through both her affidavit and deposition testimony, Moore voluntarily, knowingly, and without objections disclosed her otherwise privileged communications with attorney Hartung. Moore testified about efforts made by Hartung to obtain and have her medical records analyzed and advice he gave her regarding the viability of her cause of action. Jackson Clinic asserts that these issues are relevant in determining when the statute of limitations for Moore began to run. Jackson Clinic concludes that since Moore effectively waived her attorney-client privilege, it should be allowed to subpoena all files and documents relating to that representation and depose Hartung.

8

¶17.     The Moores respond by denying that Mrs. Moore waived the privilege. Instead, they contend that the proffered excerpts from the affidavit and deposition "contain only vague statements of what she understood from her attorney and do not relate to anything which would amount to a waiver of the attorney-client privilege."

¶18.     We disagree. While it does not appear that this Court has dealt with this precise issue, at least in the civil action context, other jurisdictions have.

¶19.     In *American Standard, Inc. v. Bendix Corp.*, 80 F.R.D. 706, 708 (W.D. Mo. 1978), American Standard alleged in its interrogatory answers that the fraudulent misrepresentation was unknown to it until discovered by its attorney. The court held that American Standard had waived the attorney client privilege in regard to these communications: "By voluntarily injecting into a litigated case, a material issue which requires ultimate disclosure by the attorney of the information, ordinarily protected by the privilege, the client makes the information discoverable." *Id.* at 709-10 (citing 4 *Moore's Federal Practice* § 26.60(2), pages 26-229 to 26-232).

¶20.     In *Metropolitan Life Insurance Co. v. Aetna Casualty & Surety Co.*, 730 A.2d 51, 52-53 (Conn. 1999), the Connecticut Supreme Court expounded three different scenarios where the attorney-client privilege is waived by voluntarily injecting a material issue into a litigated case:

> Because of the important public policy considerations that necessitated the creation of the attorney-client privilege, the "at issue," or implied waiver, exception is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship.

¶21.     In the case sub judice, Moore specifically pled reliance on Hartung's advice as an element of her defense to Jackson Clinic's motion for summary judgment. Clearly she voluntarily testified regarding

communications with Hartung. As such, she has effectively waived the privilege as it relates to the testimony that she gave.

**CONCLUSION**

¶22. When Moore used confidential communications with her attorney to toll the statute of limitations, she used the attorney-client privilege as a sword; fairness requires that she not now be allowed to hide behind the shield of that attorney-client privilege. Therefore, we reverse the trial court's decision to deny disclosure of attorney Michael Hartung's communications with the Moores. Further, we remand with instructions to the trial court to order Hartung to produce for in-camera inspection all files, correspondence, documents, or other items pertinent to this matter, beginning with the Moores' initial contact with Hartung and continuing through the decision that suit should not be filed, made after receiving Dr. Nicholls' letter of April 5, 1993. These should be delivered to the Hinds County Circuit Court for an in-camera review by the trial judge to determine whether any of these items are relevant to the discovery rule and when the statute of limitations began to run. Jackson Clinic shall be permitted discovery of all such files, correspondence, documents or other relevant items, which the trial judge has determined to be discoverable.

¶23. We further direct the trial judge to make specific findings of fact and conclusions of law as to why each item reviewed in-camera is or is not relevant. Finally, the circuit court is instructed to allow Hartung to be deposed on the issues relevant to the discovery rule and the statute of limitations.

¶24. **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH, P.J., DIAZ, CARLSON AND GRAVES, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., AND WALLER, J., NOT PARTICIPATING.**