# IN THE SUPREME COURT OF MISSISSIPPI

### NO. 2005-IA-01833-SCT
### Consolidated with
### NO. 1999-IA-01286-SCT

*THE JACKSON CLINIC FOR WOMEN, P.A., MERCER LEE, III, M.D., DARDEN H. NORTH, M.D. AND PARACELSUS WOMAN'S HOSPITAL, INC.*

*v.*

*LINDA P. HENLEY, EXECUTRIX OF THE ESTATE OF GRACE POLLES MOORE, DECEASED, AND ROBERT ALAN MOORE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES AND WRONGFUL DEATH BENEFICIARIES OF ROBERT ALAN MOORE, JR., DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/2005 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WHITMAN B. JOHNSON, III |
| | GAINES SPENCER BEARD, JR. |
| | JOSEPH L. McNAMARA |
| ATTORNEY FOR APPELLEES: | DANA J. SWAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND RENDERED - 08/09/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    The plaintiffs filed a medical malpractice action for wrongful death against the

Jackson Clinic for Women, P.A.; Mercer Lee, III, M.D.; Darden H. North, M.D.; and

Paracelsus Woman's Hospital, Inc., in the Circuit Court for the First Judicial District of

Hinds County. The defendants filed a motion for summary judgment which was denied by the Hinds County Circuit Court, Judge Tomie T. Green, presiding. The defendants then filed a petition for interlocutory appeal, which this Court granted. After a thorough review of the record and the applicable law, we reverse the circuit court judgment and render judgment here in favor of the defendants.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On August 24, 1992, Grace Polles Moore (Moore),[1] who was approximately thirty-four weeks pregnant at the time, visited Dr. Darden North, M.D. (Dr. North), at his office at the Jackson Clinic for Women, P.A., (the Clinic) complaining of abdominal pain. Moore had visited the Clinic complaining of abdominal pain on several occasions during her pregnancy. Dr. North advised Moore to take Tylenol #3 and sent her home, but the Tylenol did not ease Moore's pain. Dr. North admitted Moore to Paracelsus Woman's Hospital (Paracelsus)[2] later that same day because Moore complained that the pain radiated through her back.

¶3. The doctors considered Moore's history of drug abuse and also ran several tests on Moore which turned out normal. Moore stayed in the hospital overnight and was given Demerol every three hours. At approximately 8:15 a.m. on August 25, 1992, Moore was taken to the x-ray room at the hospital and, while there, experienced hypotension. An abdominal exam was conducted, and Moore seemed tense; thus, a sonogram was conducted.

---

[1]Moore is now deceased, and Linda P. Henley is the Executrix of Moore's Estate.

[2]Paracelsus Woman's Hospital, Inc. is now known as Woman's Hospital and is a division of River Oaks Hospital, Inc.

2

It was then discovered that Moore's baby had died in the womb due to sepsis, and a Cesarean section was performed. Additionally, Moore was diagnosed with mid-gut volvulus,[3] and a resection of Moore's small bowel, or small intestine, was performed in which Moore lost ninety percent of her small intestine.

¶4.   While still in the hospital, Moore, a registered nurse,[4] discussed what had happened to her with her sister, Dr. Alexis Polles (Alexis), a medical doctor.[5] Moore testified in her deposition as to the conversation:

> Q.   Had you talked with Alexis any about needing to pursue a claim prior to the time you went to see a lawyer?
> A.   Oh, I – this is what I said. I was in the hospital, and I had not spoken to anybody about anything of that nature.
> I looked at Alexis, and I said, "Something was wrong. Something was real wrong."
> And she said, "Grace, I'm glad you said that." She said, "We've talked about it, the family, and we know it, but we didn't want to say it to you because we didn't know if you could handle it."

Moore further testified in her deposition that her conversation with Alexis led her to believe that negligence had occurred.

---

[3]This is a condition where the small intestines twist, which effectively cuts off the blood supply to the unborn child.

[4]Moore obtained a three-year diploma in nursing from Methodist Hospital School of Nursing in Memphis, Tennessee. Moore also attended classes at Delta State University in Cleveland, Mississippi, in pursuit of a Bachelor of Nursing degree, which she never obtained.

[5]Alexis practices psychiatric medicine at Whitfield in Rankin County, Mississippi.

Q. When you talked with Alexis and you said you were still in the hospital and you had this conversation that you described, did she get into any detail with what she thought has (sic) been done wrong?

A. No, she did not.

Q. After talking with her, did you believe something had been done wrong?

A. Yes.

. . . .

Q. How about Dr. Yelverton?

A. The only thing that Dr. Yelverton has spoken of is that in retrospect it looked like this had been my problem all through my pregnancy.

. . .

A. And as a matter of fact, that was said to me by Alexis. Alexis had called and paged Dr. Yelverton when it happened, and he said those words to my sister, and my sister said them to me.

Q. Was this while you were still in the hospital?

A. Whit,[6] I don't remember. I don't remember when that was said to me.

Moore then contacted attorney Michael Hartung (Hartung) to pursue a claim on her behalf in December, 1992. Hartung requested Moore's medical records from Dr. North and Dr. Lee at the Clinic and Paracelsus on January 11, 1993; the records were sent on January 27, 1993.

¶5. Hartung had Dr. Richard A. Nicholls, M.D., (Dr. Nicholls), an expert, review Moore's medical records. While Dr. Nicholls was in the process of his review, Moore compiled a "chronology of events and specifically the items she believes were negligent." Dr. Nicholls concluded:

> After reviewing Grace Polles' medical records I have come to the following opinion as to Mrs. Polles (sic) care. Although Mrs. Polles presented at multiple times with abdominal pain during her pregnancy, she had a history of multiple gastrointestional (sic) problems and previous abdominal surgeries

---

[6]Whit Johnson is a lawyer for the defendants.

4

which alone could have accounted for her abdominal pain, manifesting the signs and symptoms that she presented with. Volvulus with gangrene of the bowel is an <u>acute</u> happening, not chronic. There was no way to diagnose this condition until it happened. It is unfortunate that the patient was pregnant at the time, because gangrene of the bowel did cause her baby's death; however, she was very fortunate that her physicians recognized that she had an acute surgical abdomen and that they acted appropriately because had they not, she would also be dead. Her physicians are not guilty of malpractice, but they are responsible for saving her life.

(Emphasis in original). Following the review of the medical records, Hartung sent a letter to Moore, which is quoted in its entirety:

I have obtained medical records from virtually all sources, and I have had them reviewed by two separate medical doctors, one of which is an OB-Gyn surgeon. Additionally, your handwritten notes were reviewed by the doctors. Unfortunately, neither of these doctors found significant evidence of medical negligence. Arguably, certain procedures could have been done sooner, but under the circumstances, both doctors concluded that good medicine was practiced and if it had not been, you would have lost your life.

Based on the forgoing, we will not be pursuing a lawsuit on your behalf. I welcome you to seek a second opinion from another attorney, and I will gladly recommend attorneys to you for this purpose.

Give me a call when you have a chance and we can discuss this further.

¶6.     Moore did contact Hartung and advised him that she wanted Alexis to review her medical records in an effort to find a doctor who would testify on Moore's behalf that medical negligence had occurred. Hartung forwarded the records to Alexis. In a letter dated July 16, 1993, Hartung advised Moore of a possible problem with the statute of limitations:

As you know, there is a potential statute of limitations problem with your claims against doctors or other medical care providers in your possible medical malpractice case. I have not heard back from your sister to whom we sent all of your medical records. Has she found a doctor who is willing to testify as to medical negligence with regard to your care and treatment?

5

Please let me hear from you at your earliest convenience.

¶7. According to her testimony in her deposition, Moore did "[n]othing at that point." Moore also stated, "I just tried to accept my life and asked God to help me and go on."

¶8. Moore was hospitalized at Mississippi Baptist Medical Center in November 1993 for chronic abdominal pain, nausea, vomiting, bloating, and diarrhea as a result of her short bowel syndrome. She was then referred to the Mayo Clinic for treatment. Moore stated in her affidavit:

> I went into the Mayo Clinic in Jacksonville, Florida on or about January 25, 1994. It was during this treatment at the Mayo Clinic that I was alerted to the fact that my treatment in August of 1992 may have been the cause of the death of my baby and of my short bowel syndrome.
>
> After being discharged, I met with Attorney Richard B. Lewis on April 11, 1994 to once again discuss a possible malpractice claim against the Defendants. At that time, I thought I had all my medical records from Mr. Hartung, although there was a lot of duplication. I was told to check with my former attorney to make sure I had all the records and obtain Dr. Nicholls' report so that a second review could be made. I believed that my former attorney had this letter and I requested that letter from him in April, 1994. When my husband went to his office to pick this up, he could not readily find it and said that it would be mailed. At the end of April of 1994, I received a copy of the letter of Dr. Nicholls, but no other part of my file. I called Mr. Hartung on May 6, 1994, to make sure I had all the records and he said he had no other records. These records were forwarded to Dr. Charles Cesare. I met with Attorney Lewis on May 26, 1994, to discuss an initial report from Dr. Charles Cesare, M.D., which was inconclusive as to whether or not there was malpractice because my medical records were incomplete. I attempted to get my prenatal records, Woman's Hospital records and other records that Dr. Cesare requested. To the best of my recollection, I was in and out of the hospital several times after my discharge from Mayo Clinic and I became physically unable to do so. However, sometime in June or July, I went to the Woman's Hospital to obtain those records. One of the girls in records told me it would be quite expensive to obtain those records and I was told that it would not cost me anything if I had the records sent to my doctor. I requested she do

6

this and it was not until the end of August or the first part of September, 1994, that I received these records from my doctor.

On September 9, 1994, I met with Attorney Lewis in Clarksdale and provided him with the complete records which were requested. Subsequently, Dr. Cesare rendered an opinion based on these records.

Dr. Charles Cesare's affidavit stated:

My initial impression was that this was a very unfortunate patient with serious complications arriving from an intestinal anomaly with probable loss of her baby secondary to low blood pressure and circulating infection in her blood stream. Based upon the medical records available at that time, it was impossible for me to render an opinion. Particularly, I needed the records of the Woman's Hospital, prenatal records from the Jackson Clinic for Women and all prior hospitalization for similar complaints as well as documentation, tests and charts, describing how this patient was taken care of on August 24, 1992, and August 25, 1992. Subsequently, on or about September 15, 1994, more complete medical records of Mrs. Moore were made available to me. Based upon the additional records of the hospital, I was able to determine that she did not receive the minimum standard of care from the treating physicians, and from the hospital, Paracelsus Woman's Hospital. She was not properly evaluated and monitored during the night. Had a proper evaluation been done, her baby could have been saved and her intestine could have been saved.

In my opinion, the type of injury sustained by Mrs. Moore resulting from the medical care given by her treating physicians, as well as Paracelsus Woman's Hospital, Inc., was a latent injury whose cause could not be readily ascertained except by a thorough review of all the medical records by a physician. I am aware that Mrs. Moore is a registered nurse, however, this would not give her the expertise necessary to determine whether or not there was a causal relationship between her injuries and the care which she received on August 24, 1992.

On October 8, 1995,[7] I met with Mr. and Mrs. Moore and informed them of my opinion.

---

[7]The correct date was October 8, 1994.

¶9.    Moore[8] filed her complaint against the Defendants in the Circuit Court of the First Judicial District of Hinds County on August 7, 1995, alleging negligence for her own injuries and the wrongful death of her unborn child. Dr. Lee, Dr. North, and the Clinic filed a Motion for Summary Judgment on November 15, 1995, asking the circuit court to dismiss the cause of action because Moore failed to file suit within two years of when she discovered negligence pursuant to Miss. Code Ann. §15-1-36 (Rev. 2003). Paracelsus filed a similar motion on December 4, 1995. The Hinds County Circuit Court, Judge Robert Gibbs, presiding, denied these motions. The defendants petitioned this Court for Interlocutory Appeal concerning the statute of limitations issue, and this petition was denied on May 22, 1996.

¶10.    The case then turned to the issue of the attorney-client privilege:

On February 20, 1997, Jackson Clinic issued a subpoena duces tecum to Mrs. Moore's previous attorney, Michael Hartung, to produce all files, correspondence, documents, or other things related to the representation of the Moores in this matter. The Moores filed a motion to quash the subpoena duces tecum, which was granted by the circuit court by order on March 10, 1997. A motion to reconsider was then filed, which was similarly denied.

On October 29, 1998, Jackson Clinic again filed a motion for summary judgment, along with a motion for disclosure of records and other relief, which was denied by the circuit court on July 19, 1999. On April 28, 2000,[9] Jackson Clinic again petitioned this Court for an interlocutory appeal, this time

---

[8]Robert Alan Moore, Moore's husband, alleged loss of consortium in the complaint. Because this is his only claim, we will simply refer to the Moores as "Moore" for clarity.

[9]The correct date of the filing of the petition for interlocutory appeal is August 3, 1999.

8

on the issue of waiver of attorney-client privilege, which this Court granted by order on April 13, 2000. *See* M.R.A.P. 5.

***Jackson Med. Clinic for Women, P.A. v. Moore***, 836 So. 2d 767, 768 (Miss. 2003).[10] The issue this Court addressed in the defendants' interlocutory appeal was whether Moore's voluntary use of advice and communications from her former attorney as a basis to avoid the defendants' statute of limitations defense waived the attorney-client privilege so as to allow the defendants to conduct discovery regarding the former attorney's file and advice. This Court held that it did, and reversed and remanded the case to the trial court, stating:

> When Moore used confidential communications with her attorney to toll the statute of limitations, she used the attorney-client privilege as a sword; fairness requires that she not now be allowed to hide behind the shield of that attorney-client privilege. Therefore, we reverse the trial court's decision to deny disclosure of attorney Michael Hartung's communications with the Moores. Further, we remand with instructions to the trial court to order Hartung to produce for in-camera inspection all files, correspondence, documents, or other items pertinent to this matter, beginning with the Moores' initial contact with Hartung and continuing through the decision that suit should not be filed, made after receiving Dr. Nicholls' letter of April 5, 1993. These should be delivered to the Hinds County Circuit Court for an in-camera review by the trial judge to determine whether any of these items are relevant to the discovery rule and when the statute of limitations began to run. Jackson Clinic shall be permitted discovery of all such files, correspondence, documents or other relevant items, which the trial judge has determined to be discoverable.
>
> We further direct the trial judge to make specific findings of fact and conclusions of law as to why each item reviewed in-camera is or is not relevant. Finally, the circuit court is instructed to allow Hartung to be deposed on the issues relevant to the discovery rule and the statute of limitations.

---

[10]This is a consolidated case on appeal.

9

*Id.* at 773-74. Thereafter, Hinds County Circuit Judge Tomie Green, presiding, duly complied with this Court's mandate. With the newly discovered information, the defendants then filed another motion for summary judgment on March 18, 2005, based upon the statute of limitations pursuant to Miss. Code Ann. § 15-1-36 (Rev. 2003). Judge Green entered an Order denying the motion on September 7, 2005. The defendants then filed a Petition for Interlocutory Appeal with this Court, which this Court granted, staying all trial court proceedings.

## DISCUSSION

¶11. "This Court has consistently held that review for summary judgment is de novo." ***PPG Architectural Finishes, Inc. v. Lowery***, 909 So. 2d 47, 49 (Miss. 2005) (citing ***Hurdle v. Holloway***, 848 So. 2d 183, 185 (Miss. 2003); ***Miller v. Meeks***, 762 So. 2d 302, 304 (Miss. 2000); ***Crain v. Cleveland Lodge 1532***, 641 So. 2d 1186, 1188 (Miss. 1994)). "A summary judgment motion is only properly granted when no genuine issue of material fact exists." ***Id.*** (citing ***Miller***, 762 So. 2d at 304); *see also* Miss. R. Civ. P. 56(c). "The moving party has the burden of demonstrating that no genuine issue of material fact exists within the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits.'" ***Id.***; *see also* ***Davis v. Hoss***, 869 So. 2d 397, 401 (Miss. 2004) (noting that the court should review all evidence available to it when making its decision); ***Anglado v. Leaf River Forest Prods., Inc.***, 716 So. 2d 543, 547 (Miss. 1998).

¶12. There is only one issue for this Court to decide in this case.

10

**WHETHER THE DISCOVERY RULE APPLIES TO TOLL THE STATUTE OF LIMITATIONS**

¶13.   The defendants/appellants argue that the discovery rule does not apply because: (1) Moore's injury was not latent; (2) Moore's inability to find an expert witness to testify in her favor did not prevent her from filing suit; and (3) Hartung had given Moore actual notice of a potential statute of limitations problem.  However, Moore argues that the discovery rule does apply because she used reasonable diligence in discovering wrongdoing. Moore further argues that the statute of limitations began to run only after she was advised by the Mayo Clinic that negligent conduct had occurred.[11]

¶14.   Very recently, this Court addressed the discovery rule as applied to medical malpractice cases, in ***Sutherland v. Ritter***, 2007 Miss. LEXIS 226 (Miss. 2007) (*r'hg denied* July 26, 2007; *mandate issued* August 2, 2007):

> The inquiry does not center on a latent injury, but rather on "the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered . . . ."  Miss. Code Ann. § 15-1-36(2) (Rev. 2003).[12]  *Thus, in medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, should have first discovered the negligence, rather than the injury.*  In applying the unambiguous language of Miss. Code Ann. § 15-1-36(2), although a hidden or unseen injury might very well serve to trigger the discovery rule and toll the statute of limitations, it is not because the injury itself is hidden or unknown, but rather because the

---

[11]This is the date that Moore states in her summary of the argument in her brief. However, she also argues in her brief that "[t]he causal relationship was not finally determined until September 1994 when Dr. Charles Cesare rendered his opinion, and arguably at that time, the statute of limitations began to run."

[12]Two exceptions are found in section 15-1-36(2) (foreign object left in patient's body and fraudulent concealment of cause of action), neither of which apply in today's case.

negligence which caused the injury is unknown. Furthermore, in the medical malpractice context, the discovery rule may apply in cases where the injury is not latent at all, but where the negligence which caused the known injury is unknown. For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However, if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.[13]

*Sutherland*, **11-12, ¶12 (emphasis added). This Court further stated:

[I]n *Hayes*, we stated that our discovery rule will only toll the statute of limitations "until a plaintiff 'should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.'" 868 So. 2d at 1000-1001 (quoting *Sarris v. Smith*, 782 So. 2d 721, 725 (Miss. 2001)). In *PPG*, we stated that "'a plaintiff knew or reasonably should have known that some negligent conduct had occurred, even if they *did not know with certainty* that the conduct was negligent as a matter of law.'" 909 So. 2d at 51 (emphasis in original) (citing *Hayes*, 868 So. 2d at 1000).

*Sutherland*, *13, ¶14. We also stated in *Sutherland*:

According to the facts of today's case, we find that Sutherland's *own suspicions and actions thereon*, together with the passage of time from when Sutherland first recognized the adverse effects from the Zyprexa until Sutherland checked himself into the hospital in April, 2001, were enough to satisfy the statutory requirement of discovery of the alleged medical negligence on the part of Dr. Ritter. Sutherland originally *knew or suspected* that Dr. Ritter's prescription of Zyprexa caused his undesirable side effects no later than the date of his discharge from St. Dominic on April 19, 2001, because he stated that "[t]he Zyprexa was destroying my life" and that "[i]t was not a belief, it was a knowing."

*Sutherland*, *14, ¶15 (emphasis added).

---

[13]Even though Miss. Code Ann. § 15-1-36(2) applied in *Sutherland*, and while on the other hand, Miss. Code Ann. § 15-1-36(1) applies in today's case since the claim accrued "on or before June 30, 1998," *Sutherland* is still directly on point since the applicable language of sections 15-1-36(1) and 15-1-36(2) is identical.

12

¶15.    In accordance with this Court's recent decision in ***Sutherland***, this issue has merit. Moore believed that *some type of negligence* had occurred while she was in the hospital talking with Alexis.  She knew that "[s]omething was wrong.  Something was real wrong." Moore then proceeded to hire an attorney, obtain her medical records, and make an outline of all of the acts that *she deemed negligent*.  This Court made clear in ***Hayes*** and ***PPG*** that the plaintiff's own suspicions regarding possible negligent conduct starts the clock running. Likewise, since Miss. Code Ann. § 11-1-58, Laws, 2002, 3rd Executive Session, ch. 2, § 6, effective from and after Jan. 1, 2003 (requiring that attorney certificate of expert consultation must accompany complaint commencing medical malpractice action), does not apply to this case.  Moore did not need an expert's opinion in order to file suit.  Accordingly, Moore knew that negligent conduct might have occurred no later than the date of her conversation with her sister, Alexis, while still in the hospital, shortly after her surgery of August 25, 1992. The statute of limitations clearly began to run by late August, 1992. Therefore, by the time Moore commenced her suit on August 7, 1995, the applicable two-year statute of limitations had long since run.

## CONCLUSION

¶16.    For the reasons stated, and consistent with our recent decision in ***Sutherland***, we find that the trial court erred in denying the defendants' motion for summary judgment on the statute of limitations issue.  Accordingly, the order denying summary judgment entered by the Circuit Court for the First Judicial District of Hinds County is reversed and judgment is

13

rendered here for the Jackson Clinic for Women, P.A.; Mercer Lee, III, M.D.; Darden H. North, M.D.; and Paracelsus Woman's Hospital, Inc.

¶17.    **REVERSED AND RENDERED**.

   **SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.    DIAZ, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

   **DIAZ, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶18.    It is undisputed that Mrs. Moore knew very soon after the loss of her child that she might have a cause of action.  The real issue, then, is when she discovered the *cause* of her injuries.  Yet the majority insists upon relying on ***Sutherland v. Ritter***, a case where a man claimed he could not discover the *injuries* he received.  2007 Miss. LEXIS 226 (Miss. 2007). Accordingly, ***Sutherland*** is legally and factually distinguishable from the present case, as our case law and common sense differentiate between the two situations.

¶19.    In our previous decision in this very case, we repeated our longstanding interpretation of the discovery rule found in Miss Code Ann. § 15-1-36(1) (Rev. 2003):

> Mississippi has a two-year statute of limitations for medical malpractice claims. Miss. Code Ann. § 15-1-36 (Supp. 2002).  The action must be "filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." ***Id.*** § 15-1-36(1).  This Court has termed this the "discovery rule" and has interpreted the rule to mean that "*the operative time is when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner*." ***Sarris v. Smith***, 782 So. 2d 721, 723 (Miss. 2001) (quoting ***Smith v. Sanders***, 485 So. 2d 1051, 1052 (Miss. 1986)).

14

***Jackson Medical Clinic for Women v. Moore***, 836 So. 2d 767 (Miss. 2003), 836 So. 2d at 770 (Cobb, J., writing for the majority. Pittman, C.J., Smith, P.J., Diaz, Carlson and Graves, J.J., concurring. Easley, J., dissenting without separate written opinion. McRae, P.J., and Waller, J., not participating) (emphasis supplied).

¶20.  Accordingly, the statute of limitations may be tolled in medical malpractice cases under three scenarios: (1) where the plaintiff is unaware of the injury; (2) where the plaintiff is unaware of the cause of the injury; or (3) where the plaintiff is unaware of the causal connection between the injury and the physician's conduct. ***Id.***; *see also **Neglen v. Breazeale***, 945 So. 2d 988, 990 (Miss. 2006); ***Powe v. Byrd***, 892 So. 2d 223, 227 (Miss. 2004); ***Fortenberry v. Memorial Hosp.***, 676 So. 2d 252, 255 (Miss. 1996). The determinative issue in this case is when Mrs. Moore reasonably could have discovered the causal connection between the physicians' alleged breach and her injuries.

¶21.  According to Mrs. Moore's sworn testimony, she was immediately advised by Dr. Yelverton of the possible failure of her treating physicians to correctly diagnose her condition. She also testified that her first attorney "thought [she] had a case, but he just didn't know enough medical people that he was centered in Jackson to send to." Therefore, Mrs. Moore was aware of a possible cause of action but failed to file a complaint before the two-year statute of limitations ran.

¶22.  Because the majority analysis is not based on the proper test, I concur in the result only.